**Richard Joseph BELK, Appellant,**

v.

**James D. PURKETT, Appellee.**

**No. 93–2484.**

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 11, 1994.

Decided Feb. 8, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied April 7, 1994.

Counsel who presented argument on behalf of the appellant was Jane C. Hogan, St. Louis, Missouri.

Counsel who presented argument on behalf of the appellee was Millie Aulbur, Assistant Attorney General, Jefferson City, Missouri.

Before MAGILL and LOKEN, Circuit Judges, and EISELE,* Senior District Judge.

EISELE, Senior District Judge.

## I.  FACTUAL BACKGROUND

Mr. Belk was convicted of second degree murder in 1983 and sentenced to fourteen years imprisonment.  He was paroled on

---

* The Honorable G. Thomas Eisele, Senior United States District Judge for the Eastern District of Arkansas sitting by designation.

July 29, 1989. On December 13, 1990, he was arrested by the Webster Groves, Missouri police department for misdemeanor harassment, second degree sexual assault, unlawful use of a weapon, and for being a fugitive from the St. Louis County Police Department on charges of second degree sexual assault and deviant sexual assault.[1] An Initial Violation Report was filed by the Missouri Board of Probation and Parole on December 28, 1990. This was followed by a second Initial Violation Report dated January 30, 1991. These two Violation Reports are referenced in a Violation Report dated February 6, 1991, although neither of these original Violation Reports were included in the record.

On January 31, 1991, Belk was given a preliminary hearing on his parole revocation at the St. Louis County Jail. Following a finding of probable cause, Belk was sent to the receiving facility at Fulton, Missouri for induction into the Missouri prison system on or about March 22, 1991. A Revocation Report was prepared by a parole officer on April 8, 1991, which referenced an interview with Belk on April 2, 1991. Belk was given a final revocation hearing on April 23, 1991 and on that date, an order of revocation was prepared. On May 3, 1991, Belk's parole was revoked. He filed the instant petition for a writ of habeas corpus on March 31, 1992 alleging that his parole was improperly revoked. Following a responsive pleading by the respondent, the Magistrate Judge, without conducting an evidentiary hearing, found that Belk was not entitled to habeas corpus relief, and the district court, without conducting a *de novo* review, adopted the Report and Recommendations of the Magistrate.

Petitioner contends that he was denied due process of law in violation of the Fourteenth Amendment in the revocation of his parole because the revocation hearings did not comport with the procedures required to revoke parolees as set forth by the United States Supreme Court. Specifically, he alleges that he was not provided adequate notice of the charges against him, that he was denied adequate opportunity to contact witnesses, that he was denied the opportunity to review the evidence against him, and that he was denied the opportunity to confront and cross-examine adverse witnesses.

## II. THE INITIAL VIOLATION REPORTS AND THE PRELIMINARY HEARING

In *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), the United States Supreme Court provided the starting point for analyzing the constitutionality of parole revocation proceedings. That decision first recognized the liberty interest of parolees:

"... [T]he liberty interest of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a "grievous loss" on the parolee and often on others.

. . . .

... [T]he State has no interest in revoking parole without some informal procedural guarantees ... A simple factual hearing will not interfere with the exercise of discretion.

. . . .

... Society has a stake in whatever may be the chance of restoring (the parolee) to normal and useful life within the law ... And society has a further interest in treating the parolee with basic fairness: fair treatment in parole revocations will enhance the chance of rehabilitation by avoiding reactions to arbitrariness."

*Morrissey*, 408 U.S. at 481–484, 92 S.Ct. at 2600–2602.

The first stage of a revocation occurs when the parolee is arrested and detained. *Morrissey* requires that the parolee be provided "some minimal inquiry ... at or reasonably near the place of the alleged parole violation as promptly as convenient after arrest while information is fresh and sources are available." *Id.* at 485, 92 S.Ct. at 2602. The Court went on to set forth more specific criteria for the preliminary hearing:

---

1. The circumstances of the fugitive charge are not clear, although it appears to have resulted from jurisdictional confusion. In any event, no action was taken on the fugitive charge and this Court need not address it further.

"[T]he parolee should be given notice that the hearing will take place and that its purpose is to determine whether there is probable cause to believe he has committed a parole violation. The notice should state what parole violations have been alleged. At the hearing the parolee may appear and speak in his own behalf; he may bring letters, documents, or individuals who can give relevant information to the hearing officer. On request of the parolee, person who has given adverse information on which parole revocation is to be based is to be made available for questioning in his presence. However, if the hearing officer determines that an informant would be subjected to risk of harm if his identity were disclosed, he need not be subjected to confrontation and cross-examination."

*Id.* at 486–487, 92 S.Ct. at 2602–2603.

The record in the instant case is silent on a number of important issues. Indeed, it often appears that the petitioner and the respondent are arguing different cases, rather than different theories of the same case. In any event, a number of statements by petitioner in his original petition for a writ of habeas corpus and in his objections to the Magistrate Judge's Report and Recommendations are never addressed, and thus never disputed, by respondent. Likewise, they were never addressed by the Magistrate Judge. Finally, they were never addressed by the trial court. The Court's concerns about the process provided in this case will be set forth in more detail below.

■ Petitioner complains that he was never provided with copies of the police reports or the complete statements of the alleged victim in this case. Respondent replied that this allegation was without merit based upon petitioner's own acknowledgment that "he received copies of the 'pertinent violation reports dated 12/28/90 and 1/30/91' ...." This is non-responsive. In the *Violation Report* dated 2/6/91 which summarizes the preliminary hearing, the writer of the report states that Mr. Belk received copies of the pertinent *Violation Reports* dated 12/28/90 and

1/30/91. That same 2/6/91 Violation Report makes reference to police reports and the signed statement of the alleged victim, which is also conspicuously omitted from this record. It is clear to this Court that the officer writing the 2/6/91 Violation Report used the term "Violation Report" as a term of art referring to reports issued by probation or parole officers assigned to cases where violations are being investigated. A Violation Report is not a police report. In this case, it appears that the initial Violation Reports of 12/28/90 and 1/30/91 may have been *based* upon a police report, or an alleged victim statement, or other information, making the violation report information little more than double hearsay.

■ The notice requirements for a preliminary revocation hearing are limited to the time, place, and purpose of the hearing, including notice as to what parole violations have been alleged. Had petitioner been provided with copies of the Initial Violation Reports in a timely manner, then it could have been argued that the minimal procedural requirements may have been met for purposes of the preliminary hearing. However, petitioner alleges that he was not provided with copies of those Initial Violation Reports until moments before the hearing, an allegation which is never disputed.

With only a few moments notice of the alleged violations, the other rights set forth by the Supreme Court for the preliminary hearing may be of little benefit. How can a parolee being held in custody be expected to bring letters, documents, or individuals who can give relevant information to the hearing officer when he does not know with what, specifically, he is being charged? How can he request the presence of persons who have given adverse information if he has no prior notice as to the information being relied upon, or the source thereof?

The charges facing Belk at his preliminary revocation hearing stemmed from his arrests for harassment, sexual assault second degree, unlawful use of a weapon and deviant sexual assault.[2] The harassment and sexual

2. The Court notes that all criminal charges in this case were subsequently dismissed. This, however, is not dispositive of the revocation issues because of the differing standards of proof.

assault charges stemmed from his relationship with Jennifer Doty. Apparently, Doty and Belk worked at a stable together and became romantically involved. At the beginning of the relationship, Doty was sixteen years old. Approximately two years later, Doty tried to curtail the relationship. Belk left a note on her car in October of 1990, followed by another note in December of 1990. Doty's father took those letters (neither of which is in the record, one of which Belk admits "did not say very nice things" about Doty) to the police. Apparently Doty had sent similar letters to Belk. Those letters are also absent from the record. Belk's two notes were the apparent basis for the harassment charge.[3]

At some point Doty made a signed statement, alleging, among other things, that she and Belk had sexual relations when she was still 16 years of age.[4] The Court does not know what else the statement says, because it was not made a part of the record. The 4/8/91 revocation report states that "Doty indicated that Belk touched and inserted his fingers into her vagina. Belk also touched Doty's vagina with his tongue and finger." The Court presumes that this is the basis of the deviant sexual assault charge.[5] The record is silent as to where, when, or how the revocation report writer received this information.

Finally, when the police arrested Belk, they searched his vehicle. A six-inch fillet knife was found under the seat of his car. This formed the basis for the unlawful use of a weapon charge.[6]

At the preliminary hearing, there was no discussion of the deviant sexual assault charge. Belk denied having sexual relations with Doty until after she turned 17. In support of his denial, he presented Janice Roberts. Apparently, Doty had stated that she and Belk had engaged in sexual relations at the home of Roberts. Roberts testified that this was not true, that Belk never had access to her apartment unless she was there and that she was always present with the two of them.

As for the knife, Belk stated that it was not his and that he did not know that it was in the car. He said that a friend, Gene Blount, had borrowed the car the previous evening to help Blount's girlfriend move, that the knife belonged to Blount, and that it must have fallen during the moving process. Blount called the writer of the 2/6/91 Violation Report two days after the preliminary hearing and verified Belk's explanation.

Belk's petition for a writ of habeas corpus states that he asked about the adverse witnesses at the preliminary hearing, but was

---

See, e.g., *Morishita v. Morris*, 702 F.2d 207, 210 (10th Cir.1983).

**3.** There is some discussion in the 2/6/91 Violation Report and the 4/8/91 Revocation Report about a tape recording that Belk made of a telephone conversation between him and Doty and about a sign that Belk had in his car. Missouri's Harassment statute reads as follows:

   1. A person commits the crime of harassment if for the purpose of frightening or disturbing another person, he
      (1) Communicates in writing or by telephone a threat to commit any felony; or
      (2) Makes a telephone call or communicates in writing and uses coarse language offensive to one of average sensibility; or
      (3) Makes a telephone call anonymously; or
      (4) Makes repeated telephone calls.
   2. Harassment is a class A misdemeanor.
V.A.M.S. § 565.090 (1979).

**4.** Missouri's Sexual Assault in the Second Degree statute provides in pertinent part:
   (1) A person commits the crime of sexual assault in the second degree if, being seventeen years old or more, he has sexual intercourse with

another person to whom he is not married who is sixteen years old.
V.A.M.S. § 566.050 (1979).

**5.** Missouri's Deviate Sexual Assault in the Second Degree statute provides in pertinent part:

   (1) A person commits the crime of deviate sexual assault in the second degree if, being seventeen years old or more, he has deviate sexual intercourse with another person to whom he is not married who is sixteen years old.
V.A.M.S. § 566.080 (1979). Deviate sexual intercourse is defined as "any sexual act involving the genitals of one person and the mouth, tongue, hand or anus of another." V.A.M.S. § 566.010 (1979).

**6.** Missouri's Unlawful Use of Weapons statute provides, in pertinent part:

   1. A person commits the crime of unlawful use of weapons if he knowingly:
   (1) Carries concealed upon or about his person a knife, a firearm, a blackjack or any other weapon readily capable of lethal use ...
V.A.M.S. § 571.030 (1981).

told that the police reports and the alleged victim's statement were all that were needed. This allegation is not disputed. In another non-responsive reply, respondent states that petitioner's allegation that the police officers (who prepared the report which formed the basis of his parole violation report) were not at the revocation hearings fails to demonstrate the required prejudice. Respondent cites cases standing for the propositions that the right to confront and cross-examine adverse witnesses is not absolute and that a petitioner denied the opportunity to confront a witness against him is not automatically entitled to relief. Respondent contends that petitioner's own admissions sufficiently corroborated the information contained in the police report concerning the charges against him. The record does not support such a contention.

The Court first notes that the most important adverse witness in this case was Doty, not the police officers. Doty's absence and the denial of petitioner's right, upon his undisputed request, to confront and cross-examine her is never addressed by respondent. Doty's father was another important adverse witness. There are undisputed allegations that two witnesses were sent away by the hearing officer before petitioner had a chance to question them. Furthermore, no fair reading of the record in this case supports a statement that Mr. Belk's own statements sufficiently corroborated the police reports in this case. He explicitly denied having sexual relations with Doty until after her seventeenth birthday, denied having any intent to harass, and denied any knowledge of the presence of a knife in his vehicle.

In certain circumstances, the admission of hearsay evidence, such as police reports or sworn victim statements, which would be inadmissible in a criminal trial is permissible in a revocation hearing. *Morrissey* specifically states that the revocation process "should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial." 408 U.S. at 489, 92 S.Ct. at 2604.

For example, this Circuit has held that the admission of a police report for the limited purpose of demonstrating that the defendant had been arrested was proper.[7] *United States v. Pattman,* 535 F.2d 1062, 1063 (8th Cir.1976). In other instances, this Circuit has upheld the use of hearsay evidence in revocation proceedings when the evidence is demonstrably reliable and when it is corroborated by the parolee's own admissions. See, e.g., *United States v. Burkhalter,* 588 F.2d 604, 607 (8th Cir.1978); *Country v. Bartee,* 808 F.2d 686, 688 (8th Cir.1987).

In deciding whether to consider hearsay statements of a witness not presented for cross-examination, the hearing officer should consider whether the hearsay evidence sought to be admitted bears substantial indicia of reliability. *United States v. Burkhalter,* 588 F.2d 604, 607 (8th Cir.1978). There are numerous accepted exceptions to the hearsay rule for substantive evidence, such as hospital records,[8] or signed laboratory reports prepared by those whose business it is to make chemical analysis.[9]

None of these cases are applicable to the case at bar. The police reports and the victim's statement were used as substantive evidence of petitioner's violations of certain laws of the state of Missouri. Indeed, if the writers of the 2/6/91 Violation Report and the 4/8/91 Revocation Report are to be taken literally, the police reports and the victim statement were used by a parole officer to create the Initial Violation Reports of 12/28/90 and 1/30/91 and those Violation Reports were the sole evidence relied upon by the hearing officers. The evidence here did

---

7. In that case, the grounds for revocation included a violation of a condition requiring the defendant to notify his probation officer if he was arrested. The underlying crimes for which he was arrested were immaterial to the revocation proceeding, and the police reports were not admitted to show that the defendant actually committed said crimes. *United States v. Pattman,* 535 F.2d 1062, 1063 n. 1 (8th Cir.1976).

8. *United States v. Simmons,* 812 F.2d 561, 564 (9th Cir.1987).

9. *State ex rel. Mack v. Purkett,* 825 S.W.2d 851 (Mo.1992).

not fall within one of the traditional exceptions to the hearsay rule, it was denied by petitioner, it was not corroborated in whole or in part by live testimony or admissions, and it was not demonstrated to be otherwise reliable.

Petitioner requested the opportunity to cross-examine the adverse witnesses, and there was no determination that there was a risk of harm to the police officers or the alleged victim if such witnesses were subjected to confrontation and cross-examination. The information within the reports and the alleged victim statement clearly carried no indicia of reliability. Indeed, the writer of the 2/6/91 Violation Report expressed concern about the reliability of the information. At the close of the 2/6/91 Violation Report, the writer concluded as follows:

> In listening to the witnesses and reading the police report, in many ways this does seem to be a struggle between two romantically involved people. However, *the possibility* that the girl may have been a minor when the intimate relationship began seems to be a distinct possibility, although denied by Belk. Ms. Doty has made a sworn statement that has done damage to Belk. In addition, the fact that he did tape record a sensitive conversation between he and Jennifer and carried a large cardboard sign advertising the sensitive information suggests that he certainly may have been harassing or trying to control Ms. Doty in some way. It is therefore felt that there is probable cause to believe Condition No. 1 has been violated.
>
> With respect to Condition No. 7, regardless of how the knife got in Mr. Belk's car, it was in fact there under the seat. *Although it would have been more conclusive if the police report would have told the results of the fingerprint test on the knife,*[10] it is still cause to believe a violation occurred.

(emphasis added). It is clear that the preliminary hearing led the writer of the 2/6/91 Violation Report to conclude that there was *probable cause* to believe that violations had

occurred, but that he was concerned about the reliability of the information leading to that conclusion.

The above discussion focuses on the initial violation reports and the preliminary hearing. It is conceivable that all of these errors could be considered harmless if remedied at the final revocation hearing. As the following discussion will demonstrate, however, such errors were never adequately remedied.

## III. THE FINAL REVOCATION RE-PORT AND HEARING

The *Morrissey* Court held that, after the preliminary hearing, there must also be an opportunity for a hearing, if it is desired by the parolee, prior to the final decision on revocation by the parole authority.

> This hearing must be the basis for more than determining probable cause; it must lead to a final evaluation of any contested relevant facts and consideration of whether the facts as determined warrant revocation. The parolee must have an opportunity to be heard and to show, if he can, that he did not violate the conditions, or, if he did, that circumstances in mitigation suggest that the violation does not warrant revocation.

*Morrissey,* 408 U.S. at 488, 92 S.Ct. at 2603. Declining to write a code of procedure, the Supreme Court limited itself to delineating the minimum requirements for the final revocation hearing:

> (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to

---

**10.** This statement leads the Court to believe that a fingerprint test was indeed conducted upon the knife. The results of that test are nowhere in the record, and thus the Court does not know whether those results would support Belk's claim.

the evidence relied on and reasons for revoking parole.

*Morrissey* at 489, 92 S.Ct. at 2604.

On April 8, 1991, a Revocation Report was prepared by a parole officer. This report, prepared almost two weeks before the April 23, 1991 final revocation hearing, relied upon the Initial Violation Report dated 12–28–90, the Initial Violation Report dated 1/30/91 and the Hearing Officer's Report dated 2/6/91. At the outset of the Revocation Report, the Conditions and Circumstances of the revocation are set forth:

> #1—LAWS: Pending charges of Assault Second Degree and Deviate Sexual Assault from St. Louis County.[11]
>
> #7—WEAPONS: 12–11–90, Belk was in possession of a six inch fillet knife.

The Revocation Report then goes on to elaborate upon the relationship between Belk and Doty. Some of the information apparently derived from the violation reports, some from the police reports, some from an interview with Belk on April 2, 1991, and some from an unidentified interview with Doty. The report discusses several things which cast some doubt upon the veracity of Doty. The writer concludes with a recommendation of revocation, but sounds a note of caution:

> A review of the investigation and evidence generated would indicate that a very youthful female became emotionally and sexually involved with Richard Belk, after which time it is evident that she elected to curtail this relationship.[12] The investigation revealed that the victim in this case did not divulge at the onset the degree of her involvement with Belk and simply solicited the aid of the police in curtailing his contact with her. *There appears to arise out of this investigation, a considerable creditability (sic) issue with both the victim and the perpetrator as to the authenticity of the information and the character of both.* However it is apparent that Mr. Belk was applying both mental and physical harassment in order to manipulate the victim in this particular case.

(emphasis added). So we have the strange situation where the writer expresses considerable doubt about the credibility of the evidence to support the "LAWS" violation actually charged, but then goes on to say it was nevertheless apparent that petitioner had harassed Doty.

The next stop along the road to revocation was the final revocation hearing. The transcript provided to the Court is identified as "Transcript of Parole Revocation Hearing." This would seem to indicate that this was a transcript of the entire hearing. The entire transcript is eight pages long. Mr. Belk is the only witness.

The entire discussion of the knife was as follows:

> "PAROLE BOARD MEMBER: Now was there a knife found in your car?
>
> MR. BELK: Yes, it seemed—Gene, the guy that I had loaned the car to the night before, in the process of moving he had let his little girl play with the stuff in the back and she had apparently dropped it out of a bag and—the car I won is a Firebird, okay, there's a floorboard in the back—it's flat— you know how most of them's kind of concave? Well it's flat until you get maybe this far in underneath the back seat—the back of the front seat, and then it slopes up. So I guess it could have possibly rolled underneath there.
>
> PAROLE BOARD MEMBER: Uh-huh— it's irrelevant how it got where it got it— the point is it was in the car, you was driving the car and it was found in your car.[13]

11. As presented for the purposes of the final hearing, these were the only "LAWS" violations charged. Harassment is not listed.

12. This is the only statement in the revocation recommendation which refers to the sexual charges. There is no finding that Doty became sexually involved with Belk prior to her seventeenth birthday, as required by the sexual assault second degree statute. There is no discussion of deviate sexual behavior as defined by the statute. In short, there is no finding that petitioner violated either of the "LAWS" conditions set forth at the beginning of the revocation report.

13. This is, of course, a misstatement of the law. The statute, supra note 5, has a "knowingly" mens rea. While "knowingly" may be inferred by circumstantial evidence, to say that Mr. Belk's knowledge is irrelevant is error. The Parole

MR. BELK: Yeah, they told me it was found in there. Gene Blunt called Webster Groves and explained to them about it because, like I said, he had the car the night before. He didn't even come in 'til late."

The entire discussion about the second degree sexual assault was as follows:

"PAROLE BOARD MEMBER: How about these charges—this sexual assault— deviant sexual assault? What's the story behind—

MR. BELK: I haven't got all of her statement. I haven't seen it. All I've seen is part, but Webster Groves, whenever they first brought that up, they asked me—she was saying this and that and the other, well, the one place where she said—the first time supposedly was January and she said an apartment over in South County where I knew exactly where she was talkin' about. I had Webster Groves call there and it was Janice Robert's apartment and Webster Groves asked her about it at the time and she told them there was no way because, as she told Mr. Williams at my preliminary hearing I had no access to that apartment and the only time I was there, she was there.

\*　\*　\*　\*　\*　\*

PAROLE BOARD MEMBER: And you're saying you never had sex with her?

MR. BELK: Not when she was sixteen, no.

PAROLE BOARD MEMBER: But when she was seventeen?

MR. BELK: Yes, ma'am, I did.

Board did not infer knowledge. It claimed that knowledge was not necessary. Unfortunately, respondent and the magistrate judge seem to make the same error, and the district court failed to conduct a de novo review. Clearly, there is no basis in this record upon which the Parole Board could have properly concluded that petitioner violated V.A.M.S. § 571.030 (note 6, *supra*). Nor is there a basis for concluding that he violated the special condition of parole regarding "WEAPONS" which was first mentioned in the final Order of Revocation. *See* note 14, *infra*.

PAROLE BOARD MEMBER: And she's saying you had sex with her when she was sixteen?

MR. BELK: Yes, ma'am. But there's also three people that are going to testify in court, if it ever comes to that, that there was—in June she was asked by them if she's been sleeping with me and told them no. One of them was an attorney."

There is also a fairly extended discussion about the possible harassment of Doty by petitioner, most of which focuses on behavior not covered by the harassment statute. *See,* note 3, *supra.* More to the point, the Revocation Report of April 8, 1991 which formed the basis for the revocation hearing, apparently abandoned the harassment charges by identifying the "LAWS" violations as "pending charges of sexual assault second degree and deviate sexual assault from St. Louis County." There is no discussion about the deviate sexual assault charge.

After the final revocation hearing, the Board of Probation and Parole issued an Order of Revocation. That order cites the reasons for revocation as being violations of condition of parole:

#1 LAWS: I will obey all the federal and state laws, municipal and county ordinances. I will report all arrests to my PO within 48 hours; and #7 WEAPONS: I will, if my parole is based on a misdemeanor involving firearms or explosives, or any felony charge, not own, possess, purchase, receive, sell or transport any firearms, ammunition or explosive device or any dangerous weapon as defined by federal state or municipal laws or ordinances.[14]

As we see, the Order does not specifically identify the "LAWS" violation(s) found. The

14. Again, we are faced with an ambiguous record. The 2/6/91 Violation Report alleges "Unlawful Use of a Weapon". The Missouri statute governing that offense, with the knowledge requirement, is quoted in relevant part at note 6, *supra.* The Order of Revocation, however, seems to indicate that Mr. Belk is being revoked for violating a special condition of parole, as quoted above. While this special condition does not specify a knowledge requirement, the law does. Possession may be actual or constructive, but under the law, possession in this context cannot be "unknowing". Due process concerns prevent any other conclusion.

Order states further that the "evidence relied upon for violation is from the Violation Report dated 1/30/91 and the Hearing Officer's Report dated 2/6/91." No mention is made of reliance upon the Revocation Report, evidence from the preliminary hearing or the final revocation hearing, statements (oral or written) by Doty or her father, the police reports, or any other information gathered in this process.

Having examined the process given petitioner in this case, let us return to the dictates of *Morrissey.* First, we consider whether the parolee received written notice of the claimed violations of parole. In this case, that is unclear. It is unclear what petitioner received and when he received it. The Violation Report dated 2/6/91 sets out all of the possible charges, but there is no indication that petitioner received that report. The Revocation Report of 4/8/91 states at the beginning that the violations are the sexual charges and the weapons charge, but then the writer appears to base his recommendation of revocation on the abandoned (or, at least, not specified) harassment charge. Again, there is no indication that petitioner received this report. In short, this record does not conclusively demonstrate that petitioner received written notice of the specific violations with which he was charged.

We next consider whether the evidence against petitioner was disclosed to him. Clearly it was not. He was not permitted to examine the written statement of the alleged victim. He did not receive the police reports. He was not given the results of the fingerprint test on the knife, if any (see note 10, *supra*). There is no indication that he was told of Doty's oral statements, or those of her father. In short, he received nothing that the Board relied upon in its revocation decision other than synopsis of other evidence prepared by a parole or probation officer.

Third, we consider whether petitioner had the opportunity to be heard in person and to present witnesses and documentary evidence. Belk complained that he was not allowed to use a telephone to contact witnesses to support his version of the story. Respondent replied that Belk did not allege that he was restricted from using the mails. Belk responded by stating that he only had phone numbers, not addresses, for some of the witnesses. In light of the undisputed errors in this case, the Court need not resolve whether denial of access to a telephone could, in itself, constitute reversible error in this case.[15] The Court simply notes that the opportunity to call and present witnesses is in dispute.

Next, we consider whether petitioner was afforded the *Morrissey* right to confront and cross-examine adverse witnesses in the absence of specific findings by the hearing officer of good cause for not allowing confrontation. In the analysis of the preliminary hearing, the Court has already discussed the fact that the cases cited by respondent supporting the admission of certain hearsay evidence in a revocation proceeding are inapposite to the facts of this case. It is clear that the critical hearsay evidence relied upon in this case was substantially lacking in any indicia of reliability.

Furthermore, although the right to confront and cross-examine witnesses is, of course, important at the preliminary hearing stage, it is far more important at the final revocation hearing. The preliminary hearing only determines probable cause. The final revocation hearing is supposed to be a final evaluation of all contested facts. And, it bears repeating, the record given to the hearing officers alerted them to some of the credibility problems inherent in the statements of Doty, the key accuser.

The importance of cross-examination and confrontation in the trial context has been addressed numerous times. "There are few subjects, perhaps, upon which [the Supreme] Court and other courts have been more nearly unanimous than in their expressions of

---

**15.** In *State ex rel. Mack v. Purkett,* 825 S.W.2d 851 (Mo.1992), the court was faced with a factually similar case, wherein the petitioner complained that he was only given one telephone call and one stamped envelope in addition to being allowed unrestricted access to his attorney. The court there noted that petitioner's attorney could have contacted the witnesses on petitioner's behalf. Here, however, there was no attorney. Nevertheless, in this case, as in *Purkett,* petitioner has failed to allege prejudice from this claim, and indeed, has not even identified the witnesses he claims he was denied access to or what the substance of their testimony would have been.

belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v. Texas,* 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1964). More recently, the Supreme Court noted:

> "Cross-examination is the principal means by which the believability of a witness and the truth of this testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e. discredit, the witness."

*Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). Whether the truth is shrouded deliberately, unconsciously, or because of bias, poor perception, or faulty memory, cross-examination can lift the veil.[16] Without this tool we can have little confidence that any decision reached will be fair or reliable because we have no assurance that the truth will out.

Hearsay testimony, which cannot be put to the fire of cross-examination, can hide biases, leave inconsistencies, provide false impressions, be mistranslated, exaggerated and distorted. "How often is testimony which, when first delivered, appears conclusive and irrefragable, entirely frittered away by [cross-examination]—so much so, that a witness well sifted not infrequently proves more against than in favor of the party that produces him." *Jackson v. Kniffen,* 2 Johns. 31, 35 (N.Y.1806).

"The right to be confronted with the witness, and to sift the truth out of a mingled mass of ignorance, prejudice, passion, and interest, in which it is very often hid, is among the very strongest bulwarks of justice." *Administrators of M'Cleskey v. Leadbetter,* 1 Ga. 551, 555 (1846).

■ While the Supreme Court has specifically provided for a lower standard for the admission of hearsay evidence in revocation proceedings, it is also clear that the Supreme Court recognized the importance of allowing confrontation of adverse witnesses, especially in the final revocation hearing. In *Morrissey,* the Court stated that for the preliminary hearing, *"(o)n request of the parolee,* person who has given adverse information on which parole revocation is to be based is to be made available for questioning in his presence." 408 U.S. at 487, 92 S.Ct. at 2603. For the final revocation hearing, the Court stated that the parolee has "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)." *Id.* at 489, 92 S.Ct. at 2604. The "on request" language is dropped.

■ Thus, respondent's contention that petitioner did not request the presence of adverse witnesses is irrelevant. A careful reading of *Morrissey* indicates that the parolee must request the presence of adverse witnesses for the preliminary hearing, as petitioner did in this case, but was denied. For the final revocation hearing, however, it is incumbent upon the state authorities to produce the witnesses upon whose testimony said authorities rely to strip a parolee of his liberty. Only when the hearing officer specifically finds good cause for disallowing confrontation is the state relieved of its burden. This reading of *Morrissey* is consistent with Federal Rule of Criminal Procedure 32.1, which is clearly intended to codify, and slightly extend, the dictates of *Morrissey* for federal revocations.[17]

---

16. As one commentator notes: "It is the experience of every court and every lawyer ... that cross-examination is the most powerful instrument known to the law in eliciting truth or in discovering error in statements made in chief, whether that error arise from mistaken judgment and careless observation and expression, or from a corrupt desire and intent to pervert the truth." Faulkner, *Silence as Hearsay,* 89 U.Pa.L.Rev. 192, 194 (1940).

17. Fed.R.Crim.Pro. Rule 32.1 provides in relevant part:

> (a) Revocation of Probation or Supervised Release.
> (1) Preliminary Hearing. Whenever a person is held in custody on the ground that the person has violated a condition of probation or supervised release, the person shall be afforded a prompt hearing ... in order to determine whether there is probable cause to hold the

We emphasize that it is the *opportunity* to confront and cross-examine adverse witnesses which is important. If, having examined a sworn written statement of an adverse witness in its entirety, the contents of which are being relied upon for revocation, a parolee specifically and expressly waives his right to confrontation, there would be no need to present the adverse witness. Such a waiver, however, will not be inferred from a silent record.

The next *Morrissey* factor, a neutral and detached hearing body, is not challenged here.

■ Finally, *Morrissey* requires a written statement by the factfinders as to the evidence relied on and the reasons for revoking parole. Although the revocation of probation or parole is within the discretion of the parole board, the analysis should not end with the mere finding of a probation violation. The Supreme Court has noted that the decision to revoke probation or parole typically involves two separate tiers: "(1) a retrospective factual question whether the probationer has violated a condition of probation; and (2) a discretionary determination by the sentencing authority whether violation of a condition warrants revocation of probation." *Black v. Romano*, 471 U.S. 606, 609, 105 S.Ct. 2254, 2257, 85 L.Ed.2d 636 (1985). Thus, a revocation decision must include both a finding that the parolee violated a condition of his parole and that the parolee should be committed to prison. Alternatives to incarceration should be considered by the sentencing authority. While the sentencing authority is not required to elaborate upon the reasons for a course not taken, it must specifically state the reason for its decision and the evidence relied upon to provide an adequate basis for review to determine if the decision rests on

permissible grounds supported by the evidence. *Id.* at 611, 105 S.Ct. at 2258–59. The broad statement that petitioner violated the condition that he "not break any laws" is not sufficient. Indeed, this Court cannot tell with complete certainty from this record the specific grounds for revocation. It is clear that the knife was partially relied upon, (again, improperly upon the record), but the Court cannot determine what other charges the Board relied upon in its decision.

■ *Morrissey* set out six *minimum requirements of due process* for parole revocation hearings. The only one of those six requirements not in dispute in this case is that of a neutral and detached hearing body. Two of the requirements may or may not have been met. Three of the six minimum requirements plainly were not met.

This Court realizes that it is often difficult to assess the validity of a *pro se* petition. Not versed in the law, the *pro se* habeas petitioner will seldom set forth the issues clearly. He may on occasion flounder in a sea of terminology and jurisprudence. In such situations, it may be difficult to reach the shores of justice without capsizing. It is in just such situations that our district courts must be most alert and where hands-on *de novo* review is most needed.

Unfortunately, in this case it appears that respondent reviewed petitioner's pleadings and, in an effort to structure his own argument, outlined petitioner's arguments in a simplified form, which failed to encompass all of the petitioner's claims. The Magistrate Judge apparently relied upon the respondent's characterization of petitioner's arguments without conducting an independent searching inquiry. The result: The petitioner was denied relief, because only the arguments noted by respondent were addressed.

---

person for a revocation hearing. The person shall be given ...

\*　\*　\*　\*　\*　\*

(C) upon request, the opportunity to question witnesses against the person unless, for good cause, the federal magistrate decides that justice does not require the appearance of the witness ...

\*　\*　\*　\*　\*　\*

(2) Revocation Hearing. The revocation hearing, unless waived by the person, shall be

held within a reasonable time in the district of jurisdiction. The person shall be given ...

\*　\*　\*　\*　\*　\*

(D) the opportunity to question adverse witnesses ...

Indeed, the Federal Rule is even stricter than *Morrissey*, allowing no exceptions to the opportunity to question adverse witnesses at the final revocation hearing. Of course, the Federal Rule does not control the state procedure, but the comparison is useful.

Petitioner again attempted to set out his arguments in his objections to the Magistrate Judge's Report and Recommendation in an eight-page, mostly single-spaced filing, four pages of which is devoted to a paragraph by paragraph attack upon the Magistrate Judge's report.

The district court in the instant case, upon receipt of petitioner's detailed objections, stated as follows:

"Petitioner's objections concerning the necessity of a 'traverse,' an evidentiary hearing, the appointment of counsel and a ruling on his motion for partial summary judgment are not specifically directed to the report and recommendation, and are, on their merits, summarily overruled. The remainder of petitioner's lengthy objections are, in the Court's view, a rehashing and expansion of the grounds asserted in the petition, which fail to 'direct the court to a specific error in the magistrate judge's proposed findings and recommendations.' This Court agrees with the *Goney* court that 'providing a complete de novo determination where only a general objection to the report is offered would undermine the efficiency the magistrate system was meant to contribute to the judicial process.'

Congress has mandated that the district court give *de novo* review to those portions of a Magistrate's report and recommendation to which objections are made. 28 U.S.C. § 636(b)(1). There is a court-created exception in some circuits: "... [T]he district court need not conduct *de novo* review when a party makes general and conclusory objections that do not direct the court to a specific error in the magistrate judge's proposed findings and recommendations." *Johnson v. Knable*, 1991 WL 87147, at *1, 1991 U.S.App.Lexis 12125, slip op. at *4 (4th Cir. May 28, 1991), *citing Orpiano v. Johnson*, 687 F.2d 44, 47–48 (4th Cir.1982); *United States v. Merz*, 376 U.S. 192, 199, 84 S.Ct. 639, 643, 11 L.Ed.2d 629 (1964); *Pendleton v. Rumsfeld*, 628 F.2d 102, 105–06 (D.C.Cir. 1980). There is language in an Eighth Circuit case which indicates this Circuit's approval of such an exception. *Branch v. Martin*, 886 F.2d 1043 (8th Cir.1989) ("In the present case, plaintiff's objections to the

magistrate's factual conclusions were timely filed and specific enough to trigger *de novo* review. *See, e.g., Goney v. Clark*, 749 F.2d 5, 7 (3d Cir.1984) (per curiam) (no *de novo* review if objections are untimely or general)").

The Eighth Circuit has, however, repeatedly emphasized the necessity of *de novo* review, and thus retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate. *Id.* at 1045. Failure to conduct *de novo* review when required is reversible error. *Id.* at 1046.

Most cases wherein the district court relies upon the untimeliness or the lack of specificity in the petitioner's objections as a basis for denying a full *de novo* review involve extensive records and/or lengthy transcripts which would make it difficult for the district court to focus upon the alleged errors if insufficiently directed by the parties. But this is not the situation here where the relevant record is strikingly brief, in part because no evidentiary hearing was ever conducted by the magistrate judge. Therefore, even had petitioner's objections lacked specificity, a *de novo* review would still have been appropriate given such a concise record. In this case, petitioner's objections went beyond a "rehashing and expansion of the grounds asserted in the petition." Although not as ideally precise as a pleading from a trained lawyer, petitioner's objections were certainly definite enough to require *de novo* review.

Petitioner has been imprisoned for almost two years now based upon revocation proceedings which did not approach the most minimal requirements of due process or reliability.

We REVERSE the judgment of the district court and REMAND with instructions that the court grant the writ unless the appropriate authority of the State of Missouri initiates a new final revocation hearing within 30 days after the remand of this case to the district court.