The COOPERATIVE FINANCE
ASSOCIATION, INC.,
Plaintiff,

v.

David GARST and Marilyn
Garst, Defendants.

David GARST, Counterclaimant,

v.

The COOPERATIVE FINANCE AS-
SOCIATION, INC., Counter-
claim Defendant.

No. C 94–3052.

United States District Court,
N.D. Iowa,
Central Division.

Feb. 21, 1996.

**1362**

Rodney P. Kubat of Whitfield & Eddy, P.L.C., in Des Moines, Iowa, and Mark A.

Shaiken of Stinson, Mag & Fizzell, P.C., in Kansas City, Missouri, for Plaintiff and Counterclaim Defendant CFA.

Peter C. Riley of the Tom Riley Law Firm, P.C., in Cedar Rapids, Iowa, for Defendant and Counterclaimant David Garst.

Timothy S. White and Allison M. Heffern of White & Johnson, P.C., in Cedar Rapids, Iowa, for Defendant Marilyn Garst.

## TABLE OF CONTENTS

I. INTRODUCTION ............................................... 1363

II. STANDARDS FOR SUMMARY JUDGMENT ............................. 1365

III. FINDINGS OF FACT ......................................... 1367
 A. Undisputed Facts ...................................... 1367
 B. Disputed Facts ........................................ 1370

IV. LEGAL ANALYSIS ............................................ 1371
 A. David Garst's Counterclaim ............................ 1371
 1. Procedural posture of the review of the order striking the counterclaim .... 1371
 2. The standard of review ................................ 1372
 3. Propriety of striking the counterclaim ................ 1373
 4. Striking of "defenses" ................................ 1377
 B. CFA's Claim ........................................... 1378
 1. Is CFA entitled to judgment on the note? .............. 1378
 a. Greenwald's authority to draw against the line of credit ............. 1378
 i. The partnership agreement ...................... 1378
 ii. The power of attorney .......................... 1379
 iii. Authority under the loan documents ............. 1380
 iv. Apparent authority established by course of conduct ........... 1380
 b. CFA's right to pursue judgment on the note ..................... 1382
 2. Who is liable on the note? ............................ 1383
 a. David Garst .................................... 1383
 b. Marilyn Garst ................................. 1384
 i. Procedural bars to Marilyn Garst's affirmative defenses ........ 1385
 ii. Adequacy of the affirmative defenses ........... 1386

V. CONCLUSION ................................................ 1388

---

## MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFF/COUNTERCLAIM DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BENNETT, District Judge.

After a falling out between partners, and a falling out between one of the partners and his wife, who also signed a note for a loan to the partnership, the question confronting the court here is, "Who pays a debt of the partnership?" One partner and his estranged wife, who are defendants here, each say, "Not I." The lender, however, says, "Either or both." In this lawsuit to recover the outstanding balance on a loan to a farming partnership, the plaintiff lender has moved for summary judgment against one of the partners and his estranged wife, both of whom signed the note on the loan. Another partner, who also signed the note, is not a party here. The defendant partner filed a counterclaim for damages allegedly caused

by misconduct of the lender in conducting business of the partnership with the other partner. The defendant partner's counterclaim has been ordered stricken by a magistrate judge as a sanction for refusal to make discovery and for failure to comply with court orders, and the lender asserts that the defendants have no defenses to the original claim. The wife of the partner has resisted summary judgment as to her by belatedly asserting various affirmative defenses arising from her purported status as merely an "accommodation party" on the loan papers. Both defendants insist genuine issues of material fact preclude the entry of summary judgment in this case.

## I. INTRODUCTION

Plaintiff Cooperative Finance Association, Inc. (CFA), filed this diversity lawsuit on July 28, 1994, seeking a judgment in the amount of the outstanding balance on a note for a loan made to a farming partnership known as Double G Ranch (DGR). The partners in DGR were Orben Greenwald and defendant David Garst. The only defendant named in the original complaint was David Garst; however, on August 23, 1994, prior to any answer, CFA filed a first amended complaint adding as a defendant David Garst's estranged wife, Marilyn Garst, who had also signed the note for the loan in question. The amended complaint seeks judgment in the sum of just over one hundred thousand dollars, plus interest, costs, and attorney fees.

Both defendants answered the amended complaint on September 22, 1994.[1] The defendants' answer consisted only of denials of some of the factual allegations in the complaint, but did not include any counter allegations or assertions of any affirmative defenses. David Garst subsequently filed a counterclaim on October 6, 1994, alleging generally that CFA was barred from recovering on the note owing to its misconduct, which apparently consisted of conducting business of the partnership with Orben Greenwald, the other member of the partnership, who is not a party here, knowing that Greenwald and David Garst were at odds over operation of the partnership, and also alleging some failure to give notice to

David Garst concerning the loan to DGR. CFA answered the counterclaim on October 24, 1994.

The parties commenced discovery, but it did not proceed altogether smoothly. Discovery requests propounded by CFA to David Garst on December 29, 1994, regarding his counterclaim, went unanswered. CFA moved to compel answers on April 27, 1995. Several hearings and status conferences with Chief Magistrate Judge John A. Jarvey during the summer and fall of 1995 and an order compelling discovery by Judge Jarvey, dated September 28, 1995, followed. Each time the issue was raised, David Garst's counsel assured the court and CFA that responses to CFA's discovery requests would be forthcoming. CFA finally moved for discovery sanctions, including dismissal of the counterclaim, on October 17, 1995. Garst has never provided responses to the discovery requests at issue. Judge Jarvey heard the motion for sanctions on January 16, 1996, and, on January 17, 1996, entered an order, *inter alia*, striking David Garst's counterclaim for failure to make discovery, pursuant to *Fed.R.Civ.P.* 37(b)(2)(B) & (C), and for failure to comply with court orders, pursuant to *Fed.R.Civ.P.* 41(b).

Judge Jarvey determined that the long record of delays, unfulfilled assurances that discovery would be forthcoming, and lack of any legitimate explanation for the delay demonstrated that the failure to make discovery or to comply with the court order compelling discovery was "willful." In determining the appropriate sanction, Judge Jarvey concluded that an award of attorney fees would give CFA "nothing that it does not already have," because, as the result of a state court receivership, CFA currently has a lien on David Garst's property that covers the debt owed CFA, interest on the debt, and CFA's attorney fees in this action. Judge Jarvey therefore concluded that striking the counterclaim was an appropriate sanction for David Garst's misconduct. No party filed objections to Judge Jarvey's order striking the counterclaim nor any motion for reconsideration of that order.

---

1. The defendants filed a joint answer, but they are represented by separate counsel and have separately resisted the present motion for summary judgment.

On February 6, 1996, although Judge Jarvey's order striking the counterclaim was not cast as a report and recommendation for dismissal, but as an order imposing discovery sanctions, in an abundance of caution, this court allowed the parties ten more days to state any objections to Judge Jarvey's determination that the counterclaim should be stricken. This court recognized something of a split in authority on the power of a magistrate judge to dismiss a claim or counterclaim as a discovery sanction, *compare Devore & Sons v. Aurora Pacific Cattle Co.,* 560 F.Supp. 236 (D.Kan.1983) (§ 636(b)(1)(A) prevents a magistrate judge from disposing of cases on the merits, but does not preclude *Fed.R.Civ.P.* 37(b) sanctions, including striking a party's counterclaim, because the district court retains the power to review for clear error or to reconsider such a decision), *with Donovan v. Gingerbread House, Inc.,* 106 F.R.D. 57 (D.Colo.1985), *rev'd and remanded on other grounds,* 907 F.2d 115 (10th Cir.1989) (a magistrate judge does not have the authority to involuntarily dismiss an action as a discovery sanction pursuant to *Fed.R.Civ.P.* 37(b)(2)(C), and the court will treat the magistrate judge's order dismissing a claim as a report and recommendation, applying *de novo* review under an arbitrary and capricious standard), but declined to resolve that dispute in this litigation. Instead, the court afforded the parties, and principally David Garst, one last opportunity to be heard on whether the counterclaim should remain part of this case.

On February 16, 1996, David Garst took advantage of this last opportunity by filing an objection to Judge Jarvey's order striking his counterclaim and defenses. His objections are four in number: (1) David Garst's counsel was involved in a trial the week of the sanctions hearing, and his motion to continue that hearing was denied, leaving him with only an inadequate opportunity to prepare for the sanctions hearing; (2) there is no substantial prejudice to CFA owing to his failure to provide discovery, because CFA's motion for summary judgment is pending and, according to David Garst, "the underlying claim and the case had, until relatively recently, been held in abeyance" until a trial scheduling order was entered; (3) since issuance of the trial scheduling order on December 12, 1995, David Garst has been recovering from hip surgery, and, prior to that time, had other "legitimate" scheduling conflicts resulting from travel outside of the United States as a representative of government affiliated and private organizations, presumably explaining his failure to comply with the discovery requests and the order compelling discovery; and (4) the discovery sanction imposed is inappropriate under the circumstances. The court will consider the adequacy of these objections in the proper place.

In the midst of the discovery dispute, on May 15, 1995, CFA moved for summary judgment in its favor against both defendants on its own claim and against David Garst on his counterclaim. Following a request for an extension of time, Marilyn Garst filed a timely resistance to the motion for summary judgment on June 16, 1995, to which CFA replied on June 26, 1995. David Garst was granted an extension until June 23, 1995, to resist the motion for summary judgment, and a further extension until July 7, 1995. However, in granting the second of these extensions, and at the same time denying CFA's motion to close briefing, the court stated that no further extensions would be granted and that any untimely resistance would be stricken, because the court believed that David Garst had already been given sufficient time to respond to CFA's summary judgment motion. David Garst's resistance was timely filed on July 7, 1995. CFA filed a timely reply to David Garst's resistance on July 21, 1995, pursuant to the final briefing deadlines established by the court.

In its May 15, 1995, motion for summary judgment, CFA seeks judgment for the unpaid balance on a 1993 Revolver Note in an amount then calculated to be $82,148.78, plus interest in the amount of $8,869.78, with interest continuing to accrue at the per diem rate of $36.57. CFA also seeks an award of attorneys fees of $58,497.00, and expenses of $5,805.26 thus far incurred, plus other expenses of $2,028.37 incurred by CFA. Thus, CFA seeks judgment in the sum of $162,986.36, plus interest, attorney fees, and expenses incurred after May 15, 1995. CFA has, from time to time, filed supplemental

affidavits of attorneys fees and expenses incurred since May 15, 1995. As grounds for summary judgment in its favor, CFA argues that amounts are due and owing under the 1993 Revolver Note; that Orben Greenwald had the authority to draw against the line of credit of $865,000 created by the loan and 1993 Revolver Note; that CFA did not violate the terms of the loan or allow DGR, the Greenwald–Garst partnership, to exceed its borrowing base; and that CFA has complied with the requirements of the Uniform Commercial Code (UCC) in seeking to recover on the note rather than against collateral in which CFA has a security interest.

Marilyn Garst has resisted the motion for summary judgment by belatedly asserting several affirmative defenses not previously pleaded. She claims that she is an "accommodation party" entitled to raise certain suretyship defenses to CFA's action against her on the 1993 Revolver Note. Specifically, she contends that conduct of CFA in the state court receivership of the partnership released or discharged her from liability on the note, because she received no notice of proceedings in that action and the duration of the debt was extended or the value of the collateral was impaired. She further contends that the 1993 Revolver Note is a contract of adhesion or is unconscionable as to her. CFA has replied to these contentions by asserting that any affirmative defenses not pleaded have been waived, and that the note in question is neither a contract of adhesion nor unconscionable.

On September 20, 1995, some months after CFA's motion for summary judgment, Marilyn Garst's resistance, and CFA's reply were filed, Marilyn Garst finally moved to amend her answer to assert baldly that she is an "accommodation party" on the 1993 Revolver Note and therefore entitled to assert certain defenses.[2] On January 17, 1996, Judge Jarvey granted Marilyn Garst leave to amend her answer, finding that the issues presented in the proffered amendment had been "in the case" since Marilyn Garst had resisted the motion for summary judgment and the proffered amendment involved "predominantly legal issues." Order of January 17, 1996, at 2.[3]

Defendant David Garst's resistance to the motion for summary judgment principally asserts the issues apparently, though imprecisely or vaguely, raised in his stricken counterclaim as grounds for denying CFA the judgment it seeks. Additionally, his resistance asserts that CFA is improperly pursuing judgment against the Garsts on the 1993 Revolver Note instead of pursuing Greenwald or the collateral identified in the companion security agreement. CFA's reply is that Garst has failed to generate any genuine issue of material fact concerning the loan or amount due thereon. Furthermore, CFA argues, Greenwald had the power to act as he did, thus binding the partnership and the signatories to the note for the amounts due, and that both Garst's liability and the propriety of CFA's conduct are apparent under governing law.

This matter is now fully submitted. The court therefore turns first to the standards for disposition of CFA's motion for summary judgment, then to the undisputed and disputed facts in this case, and ultimately to a legal analysis and disposition of CFA's motion.

## II. STANDARDS FOR SUMMARY JUDGMENT

 The Eighth Circuit Court of Appeals recognizes "that summary judgment is a

---

2. The amendments Marilyn Garst sought to make to her answer are, in their entirety, as follows:

> 14. Marilyn Garst is an "accommodation party" to the note upon which Plaintiff seeks judgment.
> 15. As an accommodation party, Marilyn Garst pleads the suretyship defense of failure to notify debtor of proceedings involving collateral on the note.
> 16. As an accommodation party, Marilyn Garst pleads the suretyship defense of discharge of indebtedness for extension of debt duration.

> 17. The note upon which Plaintiff seeks judgment is a contract of adhesion and is unconscionable.
> WHEREFORE, Defendant prays the Court dismiss Plaintiff's First Amended Complaint and that costs be taxed to the Plaintiff.

Marilyn Garst's Amended Answer, filed January 17, 1996.

3. Although the affirmative defenses stated in the proffered amendment may present "predominantly legal issues," the court recognizes that the factual circumstances from which they arise may be of some importance.

drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions,* 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Wabun–Inini,* 900 F.2d at 1238 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986)); *Hartnagel v. Norman,* 953 F.2d 394, 396 (8th Cir.1992).

■ The standard for granting summary judgment is well established. Rule 56 of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by an adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

*Fed.R.Civ.P.* 56(a), (b) & (c) (emphasis added); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Beyerbach v. Sears,* 49 F.3d 1324, 1325 (8th Cir.1995); *Munz v. Michael,* 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S.S. Great Lakes Fleet, Inc.,* 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone,* 993 F.2d 1328, 1331 (8th Cir.1993); *Woodsmith Publishing Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir.1990); *Wabun–Inini,* 900 F.2d at 1238 (citing *Fed.R.Civ.P.* 56(c)).[4] A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party or parties, here the Garsts, and give the Garsts the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Munz v. Michael,* 28 F.3d 795, 796 (8th Cir.1994); *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir.1994); *Johnson v. Group Health Plan, Inc.,* 994 F.2d 543, 545 (8th Cir.1993); *Burk v. Beene,* 948 F.2d 489, 492 (8th Cir.1991); *Coday v. City of Springfield,* 939 F.2d 666, 667 (8th Cir.1991), *cert. denied,* 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).

■ Procedurally, the moving party, here CFA, bears "the initial responsibility of informing the district court of the basis for [its] motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53); *see also Reed v. Woodruff County, Ark.,* 7 F.3d 808, 810 (8th Cir.1993). CFA is not required by Rule 56 to support its motion

---

4. An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Beyerbach,* 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394.

with affidavits or other similar materials negating the opponent's claim. *Id.*

■■■■ "When a moving party has carried its burden under Rule 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. The Garsts are therefore required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach*, 49 F.3d at 1325. Although "direct proof is not required to create a jury question, . . . to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.' " *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir.1985) (quoting *Impro Products, Inc. v. Herrick*, 715 F.2d 1267, 1272 (8th Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), *cert. denied sub nom. Metge v. Bankers Trust Co.*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). The necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir.1994).

■■■■ In *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11, *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2552–53, and *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56, the Supreme Court established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and that the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Johnson v.*

*Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990). The trial court, therefore, must "assess the adequacy of the nonmovants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial." *Hartnagel*, 953 F.2d at 396 (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552). If David or Marilyn Garst fails to make a sufficient showing of an essential element of a claim with respect to which he or she has the burden of proof, then CFA is "entitled to judgment as a matter of law" against that defendant. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53; *Woodsmith*, 904 F.2d at 1247. However, if the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment should not be granted. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Burk*, 948 F.2d at 492; *Woodsmith*, 904 F.2d at 1247. With these standards in mind, the court turns to consideration of the undisputed and disputed facts in the case.

### III. FINDINGS OF FACT

#### A. Undisputed Facts

The record and submissions of the parties demonstrate that the following facts are undisputed. Orben Greenwald [5] and defendant David Garst were the only partners in Double G Ranch (DGR), which was a partnership that came into existence in 1987 pursuant to an oral agreement. DGR was a farming operation in the business of buying, selling, and raising livestock and raising crops. On October 29, 1987, David Garst executed a Power of Attorney in favor of Orben Greenwald that allowed Greenwald to sign and execute financial instruments in David Garst's name having to do with the business of DGR. The Power of Attorney specifies that it cannot be revoked except in writing, and no written revocation appears in the record. David Garst contends that the Power of Attorney was nonetheless superseded by a formal partnership agreement in January of 1988, and is otherwise irrelevant to this litigation, because CFA did not know of or rely upon it.

---

5. Greenwald is Marilyn Garst's brother-in-law.

Certainly, Garst and Greenwald entered into a written Partnership Agreement on January 3, 1988. The critical portion of the Partnership Agreement is ¶ 7, which states in its entirety as follows:

7. MANAGEMENT DUTIES AND RESTRICTIONS. All partners shall have an equal vote in all major decisions effecting [sic] the partnership. Orben Greenwald shall function as office and farm manager for the partnership. He shall also have primary responsibility for all operations of the partnership.

No partner shall without consent of all partners endorse any notes, or act as an accommodation party, or otherwise become surety for any person. Any managing partner shall have the right to draw checks upon any bank account of the partnership, and to make, deliver and accept commercial paper in connection with the business of the partnership. Except with the consent of all partners, no partner shall, on behalf of the partnership, borrow or lend money, or make, deliver or accept any extraordinary commercial paper or execute any mortgage, security agreement, bond or lease or purchase or contract to purchase, or sell or contract to sell any property for or of the partnership, other than the type of property bought and sold in the regular course of its business.

Partnership Agreement, Double G Ranch, Plaintiff's Exhibit 5, ¶ 7. The parties agree that under this Partnership Agreement, Orben Greenwald ran the day-to-day operations of DGR and had the power to draw checks on behalf of the partnership, and that Greenwald made most of the decisions of the partnership, although Garst contends many of these decisions were over his objections. There is also no dispute that Garst provided the majority of the financial investment in the partnership, while Greenwald ran its operations and received a salary for doing so.

In 1991, CFA[6] made a loan to DGR involving a written loan agreement, a term promissory note, and a revolving promissory note in the principal amount of $865,000. The 1991 loan agreement states that no amounts will be advanced after January 31, 1992. Therefore, on February 12, 1993, CFA, DGR, Orben and Rebecca Greenwald, and David and Marilyn Garst executed three more loan documents, including another loan agreement (the 1993 Loan Agreement), another revolving promissory note in the principal amount of $865,000 (the 1993 Revolver Note), and a security agreement. It is upon the 1993 Revolver Note that CFA is suing here.

The 1993 Revolver Note states that "the undersigned Borrower, Double G Ranch, Route # 2 Box 16 Coon Rapids, Iowa 50058 (jointly and severally if more than one) ("Borrower")" promised to pay CFA the principal advanced under the note, and further stated that "the aggregate principal indebtedness outstanding at any one time shall not exceed Eight Hundred Sixty Five Thousand and No/100 ($865,000)." The 1993 Revolver Note states that it is "governed by and construed and enforced in accordance with the laws of the State of State [sic]," which the parties concede means Missouri, the place of business of CFA. The 1993 Revolver Note is signed, on behalf of DGR, by David Garst and Orben C. Greenwald, each identified as a "Partner," and, under the heading "Individually," by David Garst, Marilyn Garst, Orben Greenwald, and Rebecca Greenwald. The 1993 Revolver Note matured by its terms on February 1, 1994.

The 1993 Revolver Note provides, *inter alia,* that "[a]ll rights and remedies of Lender shall be cumulative and may be exercised singularly or concurrently, at Lender's option, and the exercise or enforcement of any one such right or remedy shall neither be a condition to nor bar the exercise or enforcement of any other." 1993 Revolver Note, ¶ 9. The other loan documents executed concurrently with the 1993 Revolver Note include identical or substantially identical language. *See* 1993 Loan Agreement, ¶ 6; 1993 Security Agreement, ¶ 7.

The 1993 Security Agreement further provides that "Secured Party shall not be obligated to . . . realize on the Collateral at all or

---

6. Because the parties do not dispute that CFA is the successor-in-interest of Farmland Financial Services, Inc. (FFS), the original lender to DGR, the court, as have the parties, will simply refer throughout to CFA as the lender.

in any particular manner or order or to apply any cash proceeds of Collateral in any particular order of application." 1993 Security Agreement, ¶ 7. The collateral in which the 1993 Security Agreement grants CFA a security interest includes all of the following property then owned or after acquired by DGR: farm products, livestock, crops, feed, seed, supplies, accounts, contract rights, general intangibles, equipment and machinery, and the proceeds thereof, and the products and progeny therefrom. CFA perfected its security interest.

Under the loan documents, DGR submitted monthly borrowing base reports, listing eligible collateral, lending margins, and computing the amount of available credit under the $865,000 revolving line of credit. Each of these reports was executed by Orben Greenwald. When credit was available under the borrowing base reports, DGR could submit a draft on CFA's bank account. Each draft was executed solely by Orben Greenwald, and each draft was honored. The borrowing base was in a negative position only twice, in May and October of 1993, but after each month, the borrowing base returned to a positive position. As collateral was sold, checks from buyers were made payable jointly to CFA and DGR, and, when forwarded to CFA for deposit, were used to reduce the amount of the balance due on the line of credit.

The partners had a dispute about sale of calves by the partnership in the fall of 1992. CFA, through some of its officers, was aware of the dispute, but at no time did David Garst order Greenwald to stop writing drafts against the 1991 revolving credit line. During this period, as at all other times, only Greenwald signed drafts and CFA honored those drafts, and it does not appear anywhere in the record that David Garst ever objected to this practice. However, David Garst describes the dispute between the partners concerning the sale of calves in late 1992 as an "impasse." Whatever the state of relations between the partners, the 1993 Revolver Note and other 1993 loan documents were nonetheless entered into in early 1993 as renewals of the 1991 loan and revolving credit line.

On or about October 26, 1993, David Garst initiated a legal action in Iowa District Court for Guthrie County for an accounting of the partnership. In those state court proceedings, Hertz Management Company was appointed as a receiver, and liquidation of the property of the partnership began. CFA was a participant in the state court action and the receiver paid over proceeds of CFA's collateral to CFA. CFA retired the term note and paid down the 1993 Revolver Note with these proceeds. The receiver made reports on the liquidation of assets of the partnership to the court. David Garst does not deny that he received or had access to those reports.

On July 5, 1994, David Garst filed a motion in the state court proceedings to stop the liquidation and to return all remaining partnership assets to him. CFA objected to the motion, but, by order dated September 30, 1994, approving a settlement among the parties, CFA was granted a lien on DGR property distributed to David Garst and other property belonging to David Garst, and the state court proceedings were terminated. The lien granted CFA included, without limitation, the DGR partnership property and other real estate set out in an itemization by the receiver, and was "to secure payment of the entire amount of the indebtedness owed by Double G, Garst and/or Greenwald to CFA, and includes, without limitation, unpaid principal, accrued interest, costs, expenses, and attorneys fees recoverable by CFA" as determined by "a court of competent jurisdiction."

In the interim, on July 28, 1994, CFA filed this lawsuit in federal court seeking a judgment in the amount of the outstanding balance on the 1993 Revolver Note, which had come due on February 1, 1994. As of May 15, 1995, the unpaid balance on the 1993 Revolver Note was calculated by CFA to be $82,148.78, plus interest in the amount of $8,869.78, with interest continuing to accrue at the per diem rate of $36.57. As of that date, CFA also claimed attorneys fees of $58,497.00, and expenses of $5,805.26 thus far incurred, plus other expenses of $2,028.37 incurred by CFA. Thus, CFA seeks judgment in the sum of $162,986.36, plus interest, attorney fees, and expenses incurred after

May 15, 1995. David Garst does not dispute this accounting, but asserts that no balance is due from him. Marilyn Garst does not appear to dispute any of these facts, but asserts disputes exist as to a number of other factual matters.

## B. Disputed Facts

Each of the defendants asserts disputes of fact which they contend should preclude summary judgment in CFA's favor on either its claim or David Garst's counterclaim. Marilyn Garst contends that there is a genuine issue of material fact as to whether or not she is merely an "accommodation party" on the 1993 Revolver Note, but she does not allege any facts, in either her statement of material facts in response to CFA's motion for summary judgment or in her amended answer, where she now asserts affirmative defenses, in support of this contention. Her references to David Garst's deposition in her statement of facts support her conclusory assertions to the extent that they show David Garst and Orben Greenwald were the only partners of DGR, that Marilyn Garst was present during the signing of the 1991 loan papers, that she was aware of a dispute between the partners and "ha[d] a great deal of knowledge as to related things" she had discussed with the Greenwalds, and that all payments by DGR to David Garst went only to David Garst, not to Marilyn Garst. In her brief, Marilyn Garst alleges that she was never consulted nor involved in any decisions of the partnership, that she never received any benefit of any loan from CFA to DGR, and that she signed the loan papers only because CFA required her to do so before granting the loan to DGR.

Marilyn Garst asserts further, again with scant statement of a factual basis or reference to parts of the record from which a factual basis could be gleaned, that there is at least a genuine issue of material fact as to whether or not she was unduly prejudiced by the disposition of the state court proceedings. Somewhat more specifically, she contends that she was prejudiced by a lack of notice of the state court proceedings, was prejudiced when collateral earmarked to satisfy the debt to CFA was returned to David Garst in those proceedings, and was prejudiced by a constructive extension of the debt in those proceedings. She further contends that there are genuine issues of material fact as to whether CFA has waived a right to seek payment from her by failing to notify her of the state court proceedings, and whether the state court proceedings relied in any way on the 1993 Revolver Note. Finally, she asserts that there is a genuine issue of material fact as to whether the loan documents were rendered contracts of adhesion or unconscionable by CFA's exploitation of her marital relationship to make her sign them.

David Garst's disputes of fact are several, but few are supported by a citation to the record or amplified by *factual* allegations. He asserts an issue of fact as to whether or not the Power of Attorney was ever terminated or superseded, and whether CFA relied upon it in any way. He also contends that there is a genuine issue of material fact as to the extent to which the partnership agreement or course of conduct authorized Orben Greenwald alone to incur liabilities of the partnership against the revolving line of credit. Although David Garst admits that Greenwald made most of the partnership decisions, he contends that these decisions were made over his objections. He contends further that the only borrower on the various loan documents is DGR, and therefore there is at least a genuine issue of material fact as to whether or not he signed the loan papers only as a surety. He contends that the failure of CFA to pursue Greenwald demonstrates that CFA has improperly released or discharged him. He further disputes the amount and reasonableness of all attorneys fees claimed by CFA.

With somewhat better references to the record, David Garst asserts that there are genuine issues of material fact, based upon the depositions of CFA employees Tom Collins and David Eggiman, as to the extent of CFA's knowledge of the dispute between the partners beginning in 1992 and whether CFA supported Greenwald's position and insisted upon certain of his actions. He also contends that it is undisputed that the partnership owed him over $700,000 for loans he had made to finance its operations. CFA admits

that David Garst has made such a claim, but contends that if such a loan or loans exist, they are immaterial to CFA's claim and David Garst's liability on it.

■ The court will consider in the proper place the extent to which any of these disputes of fact are either adequately supported, *Hartnagel*, 953 F.2d at 394, or material to the disposition of CFA's motion for summary judgment. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Beyerbach*, 49 F.3d at 1326; *Hartnagel*, 953 F.2d at 394.

## IV. LEGAL ANALYSIS

The first issue confronting the court is whether Judge Jarvey properly struck David Garst's counterclaim as a sanction for failure to make discovery and failure to comply with a court order, because whether or not the issues raised in that counterclaim continue to be part of this lawsuit will structure any further discussion of CFA's motion for summary judgment. The court will then consider CFA's motion for summary judgment on its own claim as to each of the defendants separately.

### A. David Garst's Counterclaim

### 1. Procedural posture of the review of the order striking the counterclaim

Judge Jarvey entered an order on January 17, 1996, which, among other things, struck David Garst's counterclaim as a sanction for failure to make discovery, pursuant to *Fed. R.Civ.P.* 37(b)(2)(B) & (C), and for failure to comply with court orders, pursuant to *Fed. R.Civ.P.* 41(b). No objections nor any motions to reconsider were filed within ten days thereafter.[7] This court offered the parties a further ten days within which to file objections to Judge Jarvey's order on February 6, 1996, out of an abundance of caution to protect David Garst's ability to pursue his counterclaim, and, on February 16, 1996, David Garst did indeed respond to that additional opportunity to challenge the striking of his counterclaim.

■ The court does not purport to resolve the split in authority over a magistrate judge's ability to dispose of a claim as a sanction for discovery, which the court identified in its ruling granting the parties a further opportunity to file objections and earlier in this order. However, to avoid any possibility of error, the court will conduct the *de novo* review of Judge Jarvey's order striking the counterclaim that is ordinarily afforded a magistrate judge's recommendation for dismissal upon a dispositive motion. *See, e.g., Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir.1996) ("[T]his court [has] held that where the district court does not conduct a de novo review of a magistrate judge's report where such review is required, this is reversible error."); *Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir.1995) (failure to conduct de novo review when required is reversible error);

7. Judge Jarvey did not give the parties any notice of a requirement that they file objections or identify any period of time within which such objections would have to be filed. Judge Jarvey's failure to include such a notice is certainly understandable where the order in question was not couched as a report and recommendation on a dispositive motion, but as an order imposing sanctions for failure to make discovery. In the more typical context of a report and recommendation on a dispositive motion, the court notes that the Eighth Circuit Court of Appeals has made the following comments:

As a matter of good practice, we strongly suggest that all magistrates henceforth include a clear notice in their reports and recommendations that the parties have ten days after service of a copy of the report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of

the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985). We also remind parties that objections must be timely and specific to trigger de novo review by the District Court of any portion of the magistrate's report and recommendation. *Branch [v. Martin]*, 886 F.2d [1043,] 1045–46 [(8th Cir.1989)].

Judge Jarvey routinely follows this practice when filing a report and recommendation on a dispositive motion. The court does not mean to suggest that his failure to do so here was in any respect an error, because the court will not attempt to resolve here whether a magistrate judge does or does not have the power to dispose of a claim as a sanction for discovery misconduct. Instead, having granted the parties one further opportunity to make objections, the court will simply review whether the sanction of dismissal was appropriate in the circumstances of this case.

*Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994) (holding failure to conduct de novo review when required is reversible error).

### 2. The standard of review

■■■ Both 28 U.S.C. § 636(b)(1)(C) and *Fed.R.Civ.P.* 72(b) provide that, when reviewing a recommendation for dismissal, a judge shall make a de novo determination [8] of those portions of the magistrate judge's ruling to which objections are made, and may accept, reject, or modify, in whole or in part, the findings or recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate."); *Fed. R.Civ.P.* 72(b) ("The district judge to whom the case is assigned shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions.").[9] Courts have recognized two exceptions to the *de novo* review requirement for rulings that dispose of a party's claim or claims.

■■■ Some courts have recognized an exception to the *de novo* review requirement

---

**8.** In conducting a *de novo* review of a dispositive matter, where an evidentiary hearing has been held, the Eighth Circuit Court of Appeals has held that the district court " 'must, at a minimum, listen to a tape recording or read a transcript of the evidentiary hearing.' " *Jones v. Pillow*, 47 F.3d 251, 252 (8th Cir.1995) (quoting *Branch*, 886 F.2d at 1046). The court of appeals will presume that the district court has made a proper *de novo* review absent sufficient evidence to the contrary. *Id.* at 252 (presumption of proper review is only inappropriate where there is "affirmative evidence indicating that de novo review was not performed"); *Sumlin v. United States*, 46 F.3d 48, 49 (8th Cir.1995) (presumption of proper review obtains unless the party objecting to adoption of the order makes out a *prima facie* showing that the district court failed to conduct such a review, and the presumption is not rebutted by adoption of the magistrate judge's order before objections are due); *United States v. Hamell*, 931 F.2d 466, 468 (8th Cir.), *cert. denied*, 502 U.S. 928, 112 S.Ct. 347, 116 L.Ed.2d 286 (1991) (presumption is supported by fact that court had available to it all necessary parts of the record, and is not rebutted by premature adoption before objections are due). Where the record provides no indication of whether *de novo* review was conducted, the proper review, including review of a hearing tape or transcript, is presumed. *Jones*, 47 F.3d at 253. Thus, proper *de novo* review has been presumed where the district court stated that it had " 'made a full review of the files and records,' but did not use the term 'de novo,' " *Id.* at 252 (quoting *Edmundson v. Turner*, 954 F.2d 510, 513–14 (8th Cir.), *cert. denied*, 502 U.S. 1101, 112 S.Ct. 1186, 117 L.Ed.2d 429 (1992)), but the Eighth Circuit Court of Appeals has found that the presumption could not stand where no transcript had been prepared and the court did not assert that it had listened to a tape recording instead. *Id.* at 253 (citing *Nabors v. United States*, 929 F.2d 354, 355 & n. 1

(8th Cir.1990) (per curiam); *Taylor*, 910 F.2d at 519–20; *Branch*, 886 F.2d at 1046). In *Jones*, the Eighth Circuit Court of Appeals concluded that the presumption will fall when either (1) no hearing transcript is available and there is no indication that the court listened to the tape; or (2) the court does not state that it has made a full review of the files and records, but only that it has reviewed the findings and recommendations as well as the objections. *Id.*

In the present case, however, the magistrate judge's dismissal of Mr. Garst's counterclaim was not entered following an evidentiary hearing on the merits of the claim, but was imposed as a sanction for failure to make discovery or to comply with a court order. Thus, no evidentiary hearing was conducted. The evidence of Mr. Garst's non-compliance with discovery requests and the court order of September 28, 1995, including evidence of the "willfulness" of that non-compliance, is found in the record, as are the parties' arguments and Judge Jarvey's ruling. The proper *de novo* review in this case can be conducted from this record.

**9.** Although the district court must, in most circumstances, make a *de novo* review of the magistrate judge's findings, the court of appeals in turn makes only a "clearly erroneous" review of the district court's findings of fact. *Choate v. Lockhart*, 7 F.3d 1370, 1373 n. 1 (8th Cir.1993) (citing *LoConte v. Dugger*, 847 F.2d 745, 750 (11th Cir.), *cert. denied*, 488 U.S. 958, 109 S.Ct. 397, 102 L.Ed.2d 386 (1988)). Questions of law decided by the district court are, of course, reviewed by an appellate court *de novo*. *See, e.g., Black Hills Corp. v. Commissioner of Internal Revenue*, 73 F.3d 799, 804 (8th Cir.1996) ("We review de novo legal questions and mixed questions of law and fact; we review findings of fact under the clearly erroneous standard.").

"when a party makes general and conclusory objections that do not direct the court to a specific error in the magistrate judge's proposed findings and recommendations." *Belk*, 15 F.3d at 815 (citing as recognizing or approving of this exception *United States v. Merz*, 376 U.S. 192, 199, 84 S.Ct. 639, 643–44, 11 L.Ed.2d 629 (1964); *Johnson v. Knable*, 934 F.2d 319 (table case), 1991 WL 87147, *1 (full text) (4th Cir.1991); *Goney v. Clark*, 749 F.2d 5, 7 (3d Cir.1984) (per curiam); *Orpiano v. Johnson*, 687 F.2d 44, 47–48 (4th Cir.1982); *Pendleton v. Rumsfeld*, 628 F.2d 102, 105–06 (D.C.Cir.1980)); *see also Hudson*, 46 F.3d at 786 (quoting *Belk* ). Although language in an Eighth Circuit Court of Appeals decision indicates approval of such an exception, *Branch v. Martin*, 886 F.2d 1043 (8th Cir. 1989) ("In the present case, plaintiff's objections to the magistrate's factual conclusions were timely filed and specific enough to trigger *de novo* review."), the Eighth Circuit Court of Appeals has repeatedly emphasized the necessity of *de novo* review and has specifically refused to embrace the exception suggested in *Branch*. *See Hudson*, 46 F.3d at 786; *Belk*, 15 F.3d at 815. The reason for rejection of such an exception in favor of *de novo* review, even where only general objections are made, is the need for "retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk*, 15 F.3d at 815; *see also Hudson*, 46 F.3d at 786 (quoting *Belk* ). Thus, this first exception to *de novo* review cannot be invoked in the courts of this circuit.

■ The second exception to *de novo* review of a magistrate judge's ruling disposing of a claim obtains when no timely objections at all are filed. The advisory committee notes on subdivision (b) of the rule state, "When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Fed.R.Civ.P.* 72(b), Notes Of Advisory Committee on Rules, 1983 Addition (citing *Campbell v. United States Dist. Court*, 501 F.2d 196, 206 (9th Cir.1974), *cert. denied*, 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119 (1974), and noting that this case was quoted in House Report No. 94–1609, 94th Cong.2d Sess. (1976) at 3).

The Eighth Circuit Court of Appeals has recognized that only "clear error" review is required when no objections to the magistrate judge's disposition are filed. *See, e.g., Grinder*, 73 F.3d at 795 (if no objections have been filed, district judge "would only have to review the findings of the magistrate judge for clear error").

■ Although David Garst's objection that "[t]he discovery sanction imposed is inappropriate under the circumstances" is vague and conclusory, this court will follow the rule of *Belk* and *Hudson*, rejecting the first exception to *de novo* review based on failure to make sufficiently specific objections. The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections at all is appropriate. The district court retains ultimate responsibility for disposition of a party's claim, and therefore should make a *de novo* review when presented with any objections, however ineffectually those objections may be expressed. Where no objections have been made, however, the court believes the second exception to *de novo* review may be invoked, because the court may reasonably conclude that no objections can be offered, and only clear legal error should preclude adoption of the magistrate's recommendations. That circumstance, however, does not obtain here, because some objections have been made. The court will therefore conduct a *de novo* review of Judge Jarvey's ruling striking David Garst's counterclaim as a discovery sanction and sanction for failure to comply with a court order.

### 3. *Propriety of striking the counter-claim*

CFA sought sanctions against David Garst for failure to respond to its first set of interrogatories and request for production of documents, which it propounded to David Garst on December 29, 1994. Judge Jarvey imposed a sanction of striking David Garst's counterclaim after first concluding that David Garst's failure to comply with CFA's discovery requests was willful. Under the applicable discovery rules, *Fed.R.Civ.P.*

33(b)(5) and *Fed.R.Civ.P.* 34(b), which provide for discovery by way of interrogatories or requests for documents, respectively, a party may move for an order compelling responses to unanswered discovery requests pursuant to *Fed.R.Civ.P.* 37(a). If the motion to compel is granted,

> the court shall, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees, unless the court finds that the motion was filed without the movant's first making a good faith effort to obtain the disclosure or discovery without court action, or that the opposing party's nondisclosure, response, or objection was substantially justified, or that other circumstances make an award of expenses unjust.

*Fed.R.Civ.P.* 37(a)(4)(A). Rule 37(b)(2) in turn provides for sanctions in addition to attorneys fees for failure to comply with an order compelling discovery under Rule 37(a). The sanctions available to the court under *Fed.R.Civ.P.* 37(b)(2) include, *inter alia*, entry of an order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence, and an order striking out pleadings or parts thereof, or rendering a judgment by default against the disobedient party. *Fed.R.Civ.P.* 37(b)(2)(B) & (C); *see also Comiskey v. JFTJ Corp.*, 989 F.2d 1007, 1009 (8th Cir.1993) ("Rule 37(b)(2)(C) grants a district court the authority to enter a default judgment against a party who abuses the discovery process," and entry of such a default judgment is reviewed for abuse of discretion); *Boogaerts v. Bank of Bradley*, 961 F.2d 765, 768 (8th Cir.1992) ("Rule 37(b)(2)(C) authorizes the Court to exercise discovery abuse sanctions by dismissing a

party's action, or striking pleadings or entering a default judgment against the abusive litigant.").

As the Eighth Circuit Court of Appeals recently observed, a district court has wide latitude in imposing sanctions for failure to make discovery. *Aziz v. Wright*, 34 F.3d 587, 589 (8th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 752, 130 L.Ed.2d 652 (1995). Furthermore, when the facts show willfulness and bad faith in the failure to permit discovery, the selection of a proper sanction is entrusted to the sound discretion of the district court. *Avionic Co. v. General Dynamics Corp.*, 957 F.2d 555, 558 (8th Cir. 1992) (citing *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976) (per curiam)).[10] As Judge Jarvey correctly observed, the district court's discretion in imposing sanctions is bounded by the requirement of Rule 37(b)(2) that the sanction be "just," and relate to the claim at issue in the order compelling discovery. *Id.; see also Comiskey*, 989 F.2d at 1009 ("Any sanction imposed under Rule 37 must be 'just,'" citing *Shelton v. American Motors Corp.*, 805 F.2d 1323, 1329–30 (8th Cir.1986), in turn citing *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707, 102 S.Ct. 2099, 2106–07, 72 L.Ed.2d 492 (1982)); *Fed.R.Civ.P.* 37(b)(2). In assessing the "justice" of a sanction, relevant factors include the materiality of the issue on which discovery is withheld and the difficulty posed to the seeking party by the withholding. *Avionic Co.*, 957 F.2d at 558. A party is prejudiced if the failure to make discovery impairs the party's ability to determine the factual merits of the opponent's claim or defense. *Id.*

Entry of default judgment, or the dismissal or striking of a claim, as a sanction for failure to permit discovery is "only appropriate where there has been a clear record of delay or contumacious conduct." *Taylor v.*

---

**10.** The Eighth Circuit Court of Appeals has held that no hearing is necessary before sanctions are imposed for failure to make discovery where the record demonstrates willful and bad faith failure to comply with discovery requests and the non-cooperating party could not be unfairly surprised by imposition of sanctions. *Comiskey v. JFTJ Corp.*, 989 F.2d 1007, 1012 (8th Cir.1993). How-

ever, Judge Jarvey provided the parties with an opportunity to be heard on both CFA's motion to compel discovery and CFA's motion for sanctions. Thus, David Garst was granted sufficient opportunity to be heard on whether his conduct, evident from the record, constituted willfulness or bad faith, before the sanction of striking his counterclaim was imposed.

*City of Ballwin, Mo.*, 859 F.2d 1330, 1332 (8th Cir.1988). Entry of default judgment or dismissal should be a "rare judicial act," but is appropriate as a discovery sanction, under *Fed.R.Civ.P.* 37(b)(2)(C), when a party's failure to comply has been "due to … willfulness, bad faith, or any fault of [the party]." *Comiskey v. JFTJ Corp.*, 989 F.2d 1007, 1009 (8th Cir.1993) (quoting *Societe Internationale Pour Participations Industrielles Et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 212, 78 S.Ct. 1087, 1096, 2 L.Ed.2d 1255 (1958)). Such fault is apparent where the party who has failed to comply with the discovery request was able to comply, because, for example, the information requested was not unknown to or unavailable to it. *Comiskey*, 989 F.2d at 1009–10 (citing *National Hockey League*, 427 U.S. at 643, 96 S.Ct. at 2781). Fault is also apparent where no claim of privilege is or can be asserted, and thus the failure to comply with a legitimate discovery request amounts to "flagrant bad faith" or "callous disregard" of the party's counsel's professional responsibilities. *Id.* Similarly, the Eighth Circuit Court of Appeals has found a sufficient record upon which to base a conclusion that failure to make discovery had been willful and in bad faith where the non-complying party had repeatedly failed to produce discovery in response to counsel's repeated requests and court orders. *Boogaerts*, 961 F.2d at 766 & 768.

■ Judge Jarvey found that David Garst's failure to make discovery in this case had indeed been willful. Judge Jarvey based this finding on the long record of delays, unfulfilled assurances that discovery would be forthcoming, and lack of any legitimate explanation for the delay. Such a finding comports with applicable law. *See Comiskey*, 989 F.2d at 1009–10. David Garst's objections to this finding seem to be that since mid-December of 1995, he has been recovering from hip surgery, and prior to that time he had other "legitimate" scheduling conflicts involving his travels abroad as a representative of government affiliated and private organizations. David Garst's argument, so far as the court can glean it from his objections, appears to be that a finding of "willfulness" is inappropriate in these circum-

stances. However, this court finds, upon *de novo* review and in light of the objections, that David Garst's failure to comply with discovery requests and a court order compelling discovery was "willful." The court cannot countenance a failure to comply with discovery requests for over a year on the basis of recuperation from surgery that, by David Garst's own statement, did not take place until more than eleven months after those discovery requests were first made. Nor can occasional travel outside of the United States remove the "willfulness" of failure to comply with discovery where David Garst failed to comply with the discovery requests for over a year, did not comply with the discovery request for several months even when faced with a court order compelling discovery and a motion for sanctions, and breached each of his promises to make that discovery when those promises were made to forestall an order compelling discovery or the imposition of sanctions. These excuses do not rise to the level of either inability to comply or assertion of privilege that might be sufficient to take the sting of willfulness out of failure to comply with discovery. *See, e.g., Comiskey*, 989 F.2d at 1009–10. This court finds that David Garst has still offered no legitimate explanation for his failure to comply with CFA's discovery requests, and still has not complied with the outstanding discovery requests in light of the court order and CFA's motion for sanctions. *Boogaerts*, 961 F.2d at 766 & 768. Therefore, this court concludes, David Garst's non-compliance with the discovery requests and the court order compelling discovery can only be characterized as "willful" under the circumstances.

■ Before imposing dismissal or the striking of a claim or counterclaim as a sanction for discovery abuses, under the law of this circuit, "the [district] court must investigate whether a sanction less extreme than dismissal would suffice, *unless* the party's failure was deliberate or in bad faith." *Avionic*, 957 F.2d at 558 (citing *Denton v. Mr. Swiss of Missouri, Inc.*, 564 F.2d 236, 240–41 (8th Cir.1977), and citing generally *Shelton v. American Motors Corp.*, 805 F.2d 1323, 1329–30 (8th Cir.1986)). Although he had expressly found David Garst's conduct to

be willful, Judge Jarvey nonetheless considered whether a sanction less extreme than striking David Garst's counterclaim would suffice. However, Judge Jarvey found that an award of attorney fees, authorized when an order compelling discovery is granted pursuant to *Fed.R.Civ.P.* 37(a), would give CFA "nothing that it does not already have." This conclusion was based on the outcome of the state court receivership as the result of which CFA currently has a lien on David Garst's property that covers the debt owed CFA, interest on the debt, and CFA's attorney fees in this action. This court finds, upon *de novo* review, that an award of attorneys fees would be merely duplicative of rights CFA already holds. Therefore, this court affirms the striking of David Garst's counterclaim as a "just" alternative sanction for the court to consider, and overrules David Garst's objection that the sanction was "inappropriate" in the circumstances so far as that objection can be read to relate to the question of whether some other sanction was more appropriate.

■ However, Judge Jarvey did not rest there, nor will this court upon review. Judge Jarvey also considered whether the sanction was "just" in that it properly related to the misconduct and the claim at issue. David Garst objects to Judge Jarvey's conclusion in this regard, asserting that CFA has not been prejudiced by his failure to make discovery, because CFA's motion for summary judgment on the counterclaim is currently pending. David Garst has, however, identified precisely the prejudice CFA has suffered as the result of his misconduct. In this case, the materiality of the issue on which discovery was withheld, *Avionic Co.*, 957 F.2d at 558, was precisely the information necessary for CFA to understand the nature of David Garst's counterclaims. Furthermore, David Garst's refusal to respond to the discovery in question posed considerable difficulty to CFA in attempting to mount a defense to that counterclaim, where the nature of the counterclaim was not apparent from the pleadings, when faced with such claims either at trial or on a motion for summary judgment. *Id.* Finally, a party is prejudiced if the failure to make discovery impairs the party's ability to determine the factual merits of the

opponent's claim or defense, *id.*, and, without responses to the basic discovery requested by CFA, CFA suffered precisely this prejudice, in both its defense to the counterclaim and in its assertion of entitlement to summary judgment on the counterclaim. Because all of the discovery withheld related directly to David Garst's counterclaim and impaired CFA's ability to assess the factual basis for that counterclaim and to mount a defense to it, striking the counterclaim was directly related to David Garst's misconduct. *Id.* The court, upon *de novo* review, reaches the same conclusion as did Judge Jarvey that the sanction of striking David Garst's counterclaim bore a proper relationship to David Garst's misconduct in discovery.

■ The court also finds without merit David Garst's assertion that there has been no prejudice as the result of his non-compliance with discovery, because this case had been "held in abeyance" prior to the entry of a trial scheduling order in December of 1995. The court finds no order holding this case in abeyance. Rather, during that period, CFA's motion for summary judgment has been pending before this court. Nothing about the pendency of that summary judgment motion excused David Garst from complying with a prior discovery request or an order compelling discovery entered during the pendency of the motion. David Garst's failure to comply with discovery prior to and during the pendency of a motion to which the requested discovery was directly related confirms rather than negates the prejudice suffered by CFA in its efforts to litigate this matter.

■ The court is tempted to pass over David Garst's objection based on the purported inadequacy of his counsel's opportunity to prepare for the sanctions hearing owing to trial conflicts without comment, because it finds the objection to be without merit. However, in the interest of answering each objection, as the court believes it should do on *de novo* review, the court finds that David Garst had over a year to address the matters raised in the motion for sanctions by complying with the discovery requests, over nine months to comply with discovery after the

filing of a motion to compel, over three months to comply with the order compelling discovery, and over three months to respond to the motion for sanctions. If counsel was too busy the week prior to the sanctions hearing to marshal arguments effectively in defense of the motion for sanctions, that week of conflict must be considered in light of over a year's neglect of responsibilities. David Garst was given a full and fair opportunity to argue against the motion for sanctions with fully a week's notice prior to the hearing. David Garst was in no way prejudiced by Judge Jarvey's refusal to continue the sanctions hearing when David Garst's compliance with discovery requests and a court order was so long overdue.

 The court concludes that David Garst's counterclaim has properly been stricken pursuant to *Fed.R.Civ.P.* 37(b)(2)(C) as a sanction for discovery misconduct, and therefore that counterclaim no longer forms any part of this litigation.[11] Consequently, CFA's motion for summary judgment on David Garst's counterclaim is moot.

### 4. *Striking of "defenses"*

 Furthermore, the court concludes that the contentions of the counterclaim cannot be raised as "defenses" to CFA's motion for summary judgment on CFA's own claim. In his brief in support of his resistance to CFA's motion for summary judgment, David Garst states that he "believes the acts of CFA [alleged in his counterclaim, discovery responses, and depositions] provide a defense as a result of the impairment of his surety

position or a violation of the duty of good faith. Alternatively, these affirmative acts may entitle him to an affirmative claim. Even if these actions do not provide a defense, the existence of a counterclaim provides him protection against enforcement of the underlying claim until his counterclaim is adjudicated." David Garst's Memorandum In Support Of Resistance To Motion For Summary Judgment, p. 8. Thus, it appears that David Garst is no more certain than anyone else whether his allegations of "misconduct" on CFA's part constitute defenses or counterclaims to CFA's claim on the 1993 Revolver Note. However, it is apparent that the same allegations that supported the stricken counterclaim also supported the defenses David Garst asserted against CFA's principal claim. Judge Jarvey struck those allegations as "defenses," pursuant to *Fed. R.Civ.P.* 37(b)(2)(B), as well as striking them as a "counterclaim," pursuant to *Fed.R.Civ.P.* 37(b)(2)(C). *See* Order of September 28, 1995, p. 7. For the same reasons this court affirmed striking those allegations as a counterclaim, pursuant to *Fed.R.Civ.P.* 37(b)(2)(C), the court affirms striking them as "defenses," pursuant to *Fed.R.Civ.P.* 37(b)(2)(C), as a sanction for discovery misconduct.

As the result of the striking of David Garst's "counterclaims" and "defenses," the questions remaining are whether genuine issues of material fact preclude the entry of summary judgment in this case on CFA's own claim, and whether, if there are no such genuine issues of material fact, CFA is enti-

---

11. Because this court, on review, agrees that David Garst's counterclaim may be stricken as a discovery sanction, it will not discuss in any detail whether the counterclaim could also be stricken for failure to comply with a court order compelling discovery pursuant to *Fed.R.Civ.P.* 41(b). The court, however, concludes that striking of the counterclaim was also well founded on that ground in light of the present record, both in light of the delay caused by David Garst's refusal to comply with Judge Jarvey's order compelling discovery, and the egregiousness and contumaciousness of his conduct in never providing the discovery even in light of CFA's motion for sanctions including dismissal, and Judge Jarvey's order compelling discovery. *See, e.g., Garland v. Peebles,* 1 F.3d 683, 686–87 (8th Cir.1993) (delay is one factor in considering dismissal for failure

to prosecute; others include egregiousness of conduct and adverse impact of such delay); *Omaha Indian Tribe v. Tract I—Blackbird Bend Area,* 933 F.2d 1462, 1468 (8th Cir.) (the balancing test for the propriety of dismissal for want of prosecution " 'focuses in the main upon the degree of egregious conduct which prompted the order of dismissal and to a lesser extent upon the adverse impact of such conduct upon both the defendant and the administration of justice in the District Court,' " quoting *Brown v. Frey,* 806 F.2d 801, 804 (8th Cir.1986), in turn quoting *Moore v. St. Louis Music Supply Co., Inc.,* 539 F.2d 1191, 1193 (8th Cir.1976)), *cert. denied,* 502 U.S. 942, 112 S.Ct. 379, 116 L.Ed.2d 331 (1991); *Taylor v. City of Ballwin, Mo.,* 859 F.2d 1330, 1332 (8th Cir.1988) (delay is one factor in considering dismissal for failure to make discovery).

tled to judgment as a matter of law on its claim against either David or Marilyn Garst.

## B. CFA's Claim

In the court's view, analysis of CFA's entitlement to summary judgment must proceed in two steps: (1) determination of whether CFA is entitled to judgment on the 1993 Revolver Note; and (2) if CFA is entitled to such a judgment, determination of who can be held liable for that judgment. There is no dispute that the 1993 Revolver Note matured prior to CFA's bringing this lawsuit, and, although there are disputes as to liability, there are no disputes as to the outstanding balance due on that note. Therefore, the first step of the court's analysis, determination of whether CFA is entitled to judgment on the note, involves the questions of whether Orben Greenwald could properly draw against the line of credit established by the 1993 loan documents and whether CFA can properly seek judgment on the 1993 Revolver Note without first pursuing the collateral or some other remedy. The second step in the analysis, determination of who is liable if CFA is entitled to judgment on the note, involves the questions of whether David Garst is liable as a partner on DGR's obligation and whether Marilyn Garst is entitled to, and can as a matter of fact, assert viable surety defenses to her liability on the note because she purports to be merely an "accommodation party" on the note.

### 1. Is CFA entitled to judgment on the note?

As the court observed just above, there is no dispute that the 1993 Revolver Note has matured and that there is a balance due and owing on that note. Nor is there any dispute as to the amount of the balance due or concerning what interest is due on that principal balance. The first question the court must answer to determine whether CFA is entitled to judgment on the 1993 Revolver Note is therefore whether that balance due was properly incurred, and the answer to this question turns on whether Orben Greenwald, the only person ever to execute a draft

against DGR's line of credit with CFA, had authority to do so unilaterally.

### a. Greenwald's authority to draw against the line of credit

David Garst contends that Orben Greenwald had no authority to incur the outstanding debt on behalf of the partnership. CFA, to the contrary, asserts that Greenwald had full power to draw against the partnership's line of credit under the DGR partnership agreement, the power of attorney, and the loan documents, and the apparent authority to do so as established by the course of conduct of the partners.

■ i. The partnership agreement. Under the partnership agreement, Orben Greenwald was designated the office and farm manager for the DGR partnership. Partnership Agreement, ¶ 7. As the managing partner of DGR, the partnership agreement gave Greenwald certain specific powers, including "the right to draw checks upon any bank account of the partnership, and to make, deliver and accept commercial paper in connection with the business of the partnership." Id. Under the Iowa Code of 1988,[12] the version of the Iowa Code that was in force at the time the DGR partnership agreement was signed, "commercial paper" included "drafts," which were defined as any "negotiable instruments" if they were "orders," as opposed to "notes," which were "promises." Iowa Code § 554.3104(2) (1988); and compare Iowa Code § 554.3104(2) & (5) (1995) (Article 3 of the Iowa Uniform Commercial Code is now renamed "negotiable instruments" rather than "commercial paper"). Thus, it appears that Greenwald was authorized by the DGR partnership agreement to make the drafts against the partnership's line of credit with CFA.

■ David Garst argues, however, that the drafts against the line of credit constituted "borrowing," and that Greenwald's power to "borrow" was limited by the partnership agreement to circumstances in which Greenwald had the consent of the partners. Paragraph 7 of the partnership agreement does indeed place limitations on the managing

---

12. Although the loan documents, by their terms and agreement of the parties, are governed by Missouri law, DGR was a partnership governed by Iowa law.

partner's power to "borrow" money on behalf of DGR, as follows:

> Except with the consent of all partners, no partner shall, on behalf of the partnership, borrow or lend money, or make, deliver or accept any extraordinary commercial paper or execute any mortgage, security agreement, bond or lease or purchase or contract to purchase, or sell or contract to sell any property for or of the partnership, other than the type of property bought and sold in the regular course of its business.

Partnership Agreement, ¶ 7. David Garst argues that his consent was required for Orben Greenwald to "borrow" money under the line of credit with CFA. David Garst also seems to suggest that the drafts against the line of credit with CFA were "extraordinary commercial paper," which also required his specific consent for acceptance or delivery. However, the answer to both of these contentions is the same: David Garst had already given his consent to Orben Greenwald's "borrowing" from CFA, or the execution of "extraordinary commercial paper," in connection with the line of credit with CFA by signing the loan documents that established the line of credit. The court reads the partnership agreement to require no further consent to "borrow" within the limits of the line of credit David Garst had already consented to in the 1991 and 1993 loan documents. This conclusion alone establishes the validity of the debt CFA now seeks to collect.

▮ ii. The power of attorney. CFA next argues that the 1987 Power of Attorney executed by David Garst in favor of Orben Greenwald establishes Greenwald's authority to conduct any transactions involving the line of credit with CFA. The authority granted to Greenwald by the 1987 Power of Attorney is broader than that granted to Greenwald under the written Partnership Agreement, because it imposes no subsequent consent requirement and allows Greenwald

> to sign and execute any and all instruments of a financial nature for me and in my name including but not limited to Promissory Notes or other instruments of financial obligation, making and endorsing checks, depositing funds, borrowing money, the execution of guarantys of financial

obligations of any nature, having to do with the business of Double G Ranch, a partnership consisting of David Garst and Orben Greenwald.

Power of Attorney of October 29, 1987. This Power of Attorney would certainly have granted Greenwald the authority to conduct any and all business related to the CFA line of credit without seeking any further authorization from Garst. The Power of Attorney provided that it could only be revoked in writing. Id.

David Garst argues, first, that the Power of Attorney was "superseded" by the written partnership agreement. However, he has not come forward with a written revocation of the Power of Attorney, nor pointed to any portion of the Partnership Agreement that revokes the Power of Attorney, nor pointed to any evidence in the record demonstrating that it was his or anyone else's understanding or intention that the Partnership Agreement would supersede or serve as the written revocation of the Power of Attorney. Thus, David Garst's unsupported contention that the power of attorney was revoked or superseded by the partnership agreement stands as no impediment to summary judgment in CFA's favor. *Hartnagel*, 953 F.2d at 394.

▮ David Garst next asserts that there is at least a genuine issue of material fact as to whether or not CFA relied on the Power of Attorney in conducting business regarding the line of credit with Greenwald. Although David Garst has signally failed to designate specific facts in support of this contention, *Hartnagel*, 953 F.2d at 394, in light of the court's conclusion that the Partnership Agreement authorized Greenwald to conduct business relating to the CFA line of credit, this purported dispute of fact simply is not material to the disposition of CFA's motion for summary judgment. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Beyerbach*, 49 F.3d at 1326; *Hartnagel*, 953 F.2d at 394.

Nonetheless, although the court concludes that the Power of Attorney authorized Greenwald to conduct business related to the CFA line of credit and that David Garst has failed to generate a genuine issue of material

fact that the Power of Attorney was superseded or revoked, the court does not rely on the Power of Attorney as establishing Greenwald's authority to incur obligations of DGR, and hence CFA's entitlement to judgment on one such obligation, but instead relies on the Partnership Agreement itself as establishing Greenwald's authority. To do otherwise, the court would have to conclude, also without any factual support from the record, that CFA in fact relied on the Power of Attorney as establishing Greenwald's actual or apparent authority to draw against the line of credit.

### iii. Authority under the loan documents.

CFA argues that the loan documents do not require that anyone other than Greenwald sign the drafts used by the partnership to draw against its line of credit. Specifically, CFA points out that there is no requirement that CFA poll the partners before honoring a draft executed by one of them. Rather, pursuant to ¶3 of the 1993 Loan Agreement, disbursements of the loaned funds were authorized upon the execution by the borrower of the 1993 Loan Agreement, 1993 Revolver Note, and "collateral documents," and perfection of CFA's security interest, "and thereafter from time to time upon evidence satisfactory to Lender that such proceeds are to be used by Borrower for, or to reimburse Borrower for, actual expenses incurred as contemplated by the Cash Flow Budget." 1993 Loan Agreement, ¶3. Nowhere does the court find any further authorization requirement involving both partners before funds could be disbursed pursuant to the loan documents. Furthermore, the draft proffered by CFA as an exhibit of the means by which disbursements were procured, Exhibit 6-I, does not require that it be signed by both partners.

Again, David Garst has failed to designate any facts contrary to CFA's contention that Greenwald could unilaterally draw against the line of credit on behalf of the partnership

under the loan documents themselves. *Hartnagel*, 953 F.2d at 394.

### iv. Apparent authority established by course of conduct.

CFA's final argument that Greenwald had authority unilaterally to execute drafts against the line of credit established or renewed by the 1993 loan documents is that such authority is apparent from the course of conduct of the parties. CFA points to the undisputed facts that only Greenwald ever executed drafts on behalf of the DGR partnership, Garst never objected to Greenwald's unilateral execution of the drafts, and, even at the time Garst contends the partners were at an "impasse," Garst never attempted to prevent Greenwald's unilateral execution of such drafts or asserted a right to prevent him from doing so. Although not well-developed, it appears that CFA is asserting Greenwald's apparent authority to conduct the partnership's business related to the line of credit.[13]

In *Chapman's Golf Ctr. v. Chapman*, 524 N.W.2d 422 (Iowa 1994), the Iowa Supreme Court recognized that one partner's apparent authority to act on behalf of another partner can be established by the other partner's course of conduct. *Chapman*, 524 N.W.2d at 426. In *Chapman*, one partner had signed a contract modification, and a non-signing partner claimed not to be liable for the modification. *Id.* The Iowa Supreme Court rejected this argument, finding that there was

> evidence of apparent authority in [the signing partner] to act for [the non-signing partner]. They were co-purchasers and had acted together on all matters involving prior contract modifications. In addition, [the non-signing partner] raised no objection to the 1980 modification and made payments with [the signing partner] in accordance with it. *Mermigis v. Servicemaster Indus.*, 437 N.W.2d 242, 246 (Iowa 1989); Restatement (Second) of Agency §§ 15, 15 cmt. a, 16 (1958).

---

13. CFA's authority for what the court takes to be this "apparent authority" or "course of conduct" argument is the following quotation from 68 C.J.S. Partnership § 141 (1990):

[W]here the conduct of the firm business ... is left entirely to one of the partners, as manager,

he is thereby vested with power of carrying on such business without consulting his copartners, and of binding them by all transactions in the course of the partnership business, even though a particular transaction apparently is not needed to carry on the business.

*Chapman,* 524 N.W.2d at 426. Similarly, the test of apparent authority under Iowa law is that

the principal must have acted in such a manner as to lead persons dealing with the agent to believe the agent has authority.... Apparent authority as between the principal and third persons, must be determined by what the principal said and did rather than by the acts or statements of the purported agent.

*Clemens Graf Droste Zu Vischering v. Kading,* 368 N.W.2d 702, 711 (Iowa 1985) (internal citations omitted) (citing *State v. Sellers,* 258 N.W.2d 292, 297 (Iowa 1977); *Spencer Concrete Prods. Co. v. City of Spencer,* 254 Iowa 87, 116 N.W.2d 455 (1962); and Restatement (Second) Agency § 27 (1958)); *Giese Constr. Co., Inc. v. Randa,* 524 N.W.2d 427, 431 (Iowa Ct.App.1994) (citing *Kading* ).

■ This theme of apparent authority of a partner to act on behalf of another partner in light of the conduct of the partners or the conduct of the business of the partnership is also statutorily based in Iowa. The Iowa Uniform Partnership Act provides as follows:

1. Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority.

Iowa Code § 486.9(1) (1995) (formerly Iowa Code § 544.9); *see also Kristerin Dev. Co. v. Granson Inv.,* 394 N.W.2d 325, 329 (Iowa 1986). Under this provision, "one partner can bind the partnership to a contract if he or she appears to act in the usual course of the partnership business." *Kristerin Dev.,* 394 N.W.2d at 329. In *Kristerin Dev.,* the Iowa Supreme Court stated that the statute "invites a two-step analysis": (1) the factfinder must determine whether the partner or partners executing an agreement apparently acted to carry on the partnership business in the usual way, and if so, the inquiry ends there, *unless* (2) the person with whom the partner was dealing knew the latter in fact had no authority to bind the partnership. *Kristerin Dev.,* 394 N.W.2d at 330.

■ In the present case, the undisputed facts show that Garst and Greenwald acted together on the 1991 and 1993 loans, and, in addition, Garst raised no objection to Greenwald's signing of drafts against the line of credit established by those documents or the application of partnership income to payments against that line of credit. *Chapman,* 524 N.W.2d at 426. Looking at what Garst did, or in this case, did not do, rather than at what Greenwald did, would lead CFA to believe that Garst clothed Greenwald with the authority to draw against the partnership's line of credit. *Kading,* 368 N.W.2d at 711. Furthermore, it is apparent from the undisputed facts in the record that Greenwald, by drawing against the line of credit, was apparently carrying on in the usual way the business of the partnership of which he was a member, and nothing Garst ever did would have suggested to CFA that Greenwald in fact had no such authority. Iowa Code § 486.9(1) (1995); *Kristerin Dev.,* 394 N.W.2d at 330. Thus, the court concludes that there is no genuine issue of material fact that Greenwald had the apparent authority to draw against the partnership's line of credit with CFA.[14]

The court concludes that Garst has failed to show a genuine issue of material fact that

---

**14.** Although, as the court has said, it believes that the partnership is governed by Iowa law, even if the loan documents are governed by Missouri law, the court finds that Missouri law would require no different conclusion. *See, e.g., C–4 Corp. v. E.G. Smith Constr. Prods.,* 894 S.W.2d 242, 245 (Mo.Ct.App.1995) ("The rule that a partnership is liable on a contract entered by one of its members is based on the theory of agency," citing *Locatelli v. Flesher,* 276 S.W. 415, 417 (Mo.Ct.App.1925), and "[a]ll partners are liable jointly and severally for everything chargeable to the partnership ... and for all other debts and obligations of the partnership," quoting Mo. Rev.Stat. § 358.150 (1986)); *Dwyer v. ING Inv. Co., Inc.,* 889 S.W.2d 902, 906 (Mo.Ct.App.1995) (also citing Mo.Rev.Stat. § 358.150 as determinative of liability of partners for obligations of the partnership).

Greenwald did not have the actual authority under the DGR partnership agreement or the loan documents, or the apparent authority under the partners' course of conduct, to draw against the partnership's line of credit with CFA. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Beyerbach,* 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394. Rather, the partnership agreement, the loan documents, and the conduct of the partners establish as a matter of law that CFA, barring other impediments, is entitled to summary judgment on liabilities incurred by Orben Greenwald under the 1993 Revolver Note. *Fed.R.Civ.P.* 56(c); *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

### b. CFA's right to pursue judgment on the note

David Garst does, however, attempt to raise such a further impediment to summary judgment in CFA's favor. Garst argues that CFA is improperly pursuing judgment on the 1993 Revolver Note without first pursuing the collateral under the security agreement or pursuing Greenwald, either first or jointly with Garst. There are two answers to these contentions.

▇▇▇ First, the 1993 loan documents specifically provide that CFA may, at its option, pursue any of its remedies and need not do so in any particular order. Specifically, the 1993 Revolver Note provides, *inter alia,* that "[a]ll rights and remedies of Lender shall be cumulative and may be exercised singularly or concurrently, at Lender's option, and the exercise or enforcement of any one such right or remedy shall neither be a condition to nor bar the exercise or enforcement of any other." 1993 Revolver Note, ¶ 9. The other loan documents executed concurrently with the 1993 Revolver Note include identical or substantially identical language. *See* 1993 Loan Agreement, ¶ 6; 1993 Security Agreement, ¶ 7. Furthermore, the 1993 Security Agreement provides that "Secured Party shall not be obligated to ... realize on the Collateral at all or in any particular manner or order or to apply any cash proceeds of Collateral in any particular order of application." 1993 Security Agreement, ¶ 7.

Garst's arguments cannot stand in light of the specific terms of these loan documents.

▇▇▇ Second, Missouri law, which governs the loan documents, also provides for the course of action CFA has adopted here. The Missouri Court of Appeals has held that "where the party assumes primary liability for the debt, that liability is unaffected by any acts or omissions of the creditor in relation to the loan collateral." *Manzo v. Metro No. State Bank,* 759 S.W.2d 77, 81 (Mo.Ct. App.1988) (citing *Lemay Bank & Trust Co. v. Lawrence,* 710 S.W.2d 318, 323 (Mo.Ct.App. 1986), in turn citing *Commerce Bank of St. Louis, N.A. v. Wright,* 645 S.W.2d 17 (Mo.Ct. App.1982)); *see also State Bank of Fisk v. Omega Elect., Inc.,* 634 S.W.2d 234, 239 (Mo. Ct.App.1982) (creditor is "under no obligation to repossess or foreclose the security before bringing suit on the note," citing, *e.g., State v. Newhart,* 539 S.W.2d 486, 491 (Mo.Ct.App. 1976); *Boydston v. Bank of Camden Point,* 141 S.W.2d 86, 88 (Mo.Ct.App.1940)). Furthermore, Missouri's version of the Uniform Commercial Code (UCC) also provides that when a debtor is in default under a security agreement, the creditor "may reduce his claim to judgment, foreclose or otherwise enforce the security interest by any available judicial procedure." Mo.Rev.Stat. § 400.9–501(1). Thus, CFA was not obligated to pursue the collateral before pursuing a judgment on the 1993 Revolver Note. Finally, Missouri's version of the UCC provides for CFA's action only against Garst, instead of against Greenwald or against both Greenwald and Garst, under Mo.Rev.Stat. § 400.3–116(a). That statutory provision states, "Except as otherwise provided in the instrument, two or more persons who have the same liability on an instrument as makers, drawers, acceptors, endorsers who endorse as joint payees, or anomalous endorsers are jointly and severally liable in the capacity in which they sign." Mo.Rev.Stat. § 400.3–116(a). Greenwald and Garst both signed the 1993 Revolver Note in the same capacity, both as "Partners" of DGR and "Individually." Nowhere do the loan documents "otherwise provide" for the liability of Greenwald or Garst, such that their liability would not be joint and several as stated under the statute. Therefore, CFA may pursue Garst

and Greenwald either jointly or severally, and has elected to pursue Garst first. Mo. Rev.Stat. § 400.3–116(a).[15]

Thus, the court concludes that there is no impediment to summary judgment on the 1993 Revolver Note. There are no genuine issues of material fact as to the validity of the debt or CFA's right to pursue the judgment it seeks, and CFA is entitled to pursue that judgment as a matter of law. *Fed.R.Civ.P.* 56(c); *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53. The remaining question for the court to resolve is, who can be held liable for a judgment on the 1993 Revolver Note?

### 2. Who is liable on the note?

Because CFA is entitled to judgment on the 1993 Revolver Note, the court must next determine whether, as a matter of law, either or both of the present defendants, David and Marilyn Garst, can be held liable for that judgment. The court will consider the liability of David and Marilyn Garst separately, beginning with David Garst.

#### a. David Garst

David Garst contends that he cannot be held liable of the 1993 Revolver Note, because the only "borrower" on that note is identified as "Double G Ranch." He contends that it is obvious from this circumstance that he only signed the note as a "surety." [16] However, David Garst does not, and indeed cannot in light of the record, generate any genuine issue of material fact as to whether or not he was a partner of DGR. CFA contends that Garst, as one of the partners in DGR, and as a person who signed the 1993 Revolver Note in that capaci-

ty, is liable as a "maker" of the note or is otherwise liable as a partner for this debt of the partnership.

The 1993 Revolver Note states that "the undersigned Borrower, Double G Ranch, Route # 2 Box 16 Coon Rapids, Iowa 50058 (jointly and severally if more than one) ("Borrower")" promised to pay CFA the principal advanced under the note. David Garst signed the note as a "Partner," and also under the heading "Individually." Under both Iowa and Missouri law, a partner is liable for the debts of the partnership. *See, e.g.,* Iowa Code § 486.15 (formerly Iowa Code § 544.15) (all partners are jointly liable for all debts or obligations of the partnership, except that they are jointly and severally liable for a partner's wrongful acts or breach of trust); *Bridgman v. Curry,* 398 N.W.2d 167, 174 (Iowa 1986) (joint venturers and partners are jointly liable to pay obligations of the joint venture or partnership); *Kristerin Dev.,* 394 N.W.2d at 332 (partners are jointly, and in some cases jointly and severally, liable for obligations of the partnership); *Carlson v. Carlson,* 346 N.W.2d 525, 526–27 (Iowa 1984) (passage of Iowa Uniform Partnership Act, then Iowa Code Ch. 544, now Ch. 486, was statutory rejection of "entity" theory of partnership, instead establishing, in § 544.15, the joint and several liability of partners for the partnership's debts); *Welker v. Langtry Farm Partnership,* 463 N.W.2d 97, 100 (Iowa Ct.App.1990) ("As a general rule, all partners are jointly liable for all debts and obligations of a partnership," citing former Iowa Code § 544.15); *accord* Mo. Rev.Stat. § 358.150 ("All partners are liable jointly and severally for everything charge-

---

**15.** In a defense this court believes has been stricken as a discovery sanction, Garst contends that CFA has improperly released or discharged Greenwald. However, Mo.Rev.Stat. § 400.3–116 also demonstrates the irrelevance of such a defense. Pursuant to the statute, a party having joint and several liability who pays the instrument is entitled to receive contribution from any party having the same joint and several liability, even where that other party has been discharged. Mo.Rev.Stat. § 400.3–116(b) & (c). If David Garst believed that CFA was improperly pursuing him to the exclusion of pursuing Greenwald, Garst is not without remedies of his own against Greenwald.

**16.** Any other defenses David Garst has attempted to raise to liability on the note have been stricken as part of the discovery sanctions imposed by Judge Jarvey and affirmed by this court, or were disposed of above in the court's determination that CFA has not improperly pursued Garst on the 1993 Revolver Note instead of pursuing either the collateral or Orben Greenwald. The court will not here consider the question of whether David Garst has properly raised the affirmative defense that he signed the 1993 Revolver Note only as a "surety," because the court finds that defense meritless, even if it is not procedurally barred.

able to the partnership ... and for all other debts and obligations of the partnership."); *C-4 Corp. v. E.G. Smith Constr. Prods.*, 894 S.W.2d 242, 245 (Mo.Ct.App.1995) (quoting § 358.150 as establishing liability of partners for debts of partnership); *Dwyer v. ING Inv. Co., Inc.*, 889 S.W.2d 902 (Mo.Ct.App.1995) (citing Mo.Rev.Stat. § 358.150 as determinative of liability of a partner); *Boatmen's First Nat'l Bank of Kansas City v. Bogina Petroleum Eng'rs*, 794 S.W.2d 703, 705 n. 2 (Mo.Ct.App.1990) (liability of partners is primary on note of partnership, and partners who were purported "guaranties" "[i]n effect ... simply obligated themselves twice for the same debt—once on the note and again on the 'guaranty,'" and the "guaranty" was therefore not a guaranty of the note). Indeed, under Missouri law, "[a]n action cannot be brought against the partnership in the firm name, but rather, must be brought against the individual partners," *Terre du Lac Ass'n, Inc. v. Terre Du Lac, Inc.*, 737 S.W.2d 206 (Mo.Ct.App.1987); *Baum v. Glen Park Properties*, 660 S.W.2d 723, 725 (Mo.Ct. App.1983), and, because of the joint and several liability of partners for partnership debts, a plaintiff has the option to sue any individual partner and, if successful, may hold that partner liable for the entire debt of the partnership. *Smith v. Wohl*, 702 S.W.2d 905, 910 (Mo.Ct.App.1985) (citing for this proposition Mo.Rev.Stat. § 358.150).

▆▆▆ David Garst does not dispute that he was a partner of DGR, and his assertion that he signed the 1993 Revolver Note only as a surety is therefore legally untenable. Although David Garst may have signed the note twice, once as a partner, and once as a surety, he merely obligated himself twice for the same debt. *Bogina Petroleum Eng'rs*, 794 S.W.2d at 705 n. 2. As a partner, David Garst is liable for the debt of the DGR partnership evidenced by the 1993 Revolver Note.[17] The court concludes that CFA is

entitled to summary judgment against David Garst on the 1993 Revolver Note as a matter of law. *Fed.R.Civ.P.* 56(c); *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

#### b. Marilyn Garst

The issue the court found meritless when raised by David Garst is of central importance to the consideration of Marilyn Garst's liability under the 1993 Revolver Note, *i.e.*, the question of whether Marilyn Garst is only a "surety" under the note, because she purports to be an "accommodation party" on that note. Therefore, the court must here consider not only the merits of Marilyn Garst's contention, at least as far as to determine whether she has generated a genuine issue of material fact on her "surety" defenses precluding summary judgment, but also whether she is now procedurally barred from asserting those affirmative defenses.

▆▆▆ First, the court notes that each of the defenses Marilyn Garst now asserts to her liability on the 1993 Revolver Note is indeed an "affirmative defense." *See, e.g., Hornbeck v. All Am. Indoor Sports, Inc.*, 898 S.W.2d 717, 721 (Mo.Ct.App.1995) (release is an affirmative defense); *St. Francis Medical Ctr. v. Sheffer*, 892 S.W.2d 394, 396 (Mo.Ct. App.1995) (discharge is an affirmative defense); *Lindell Trust Co. v. Lieberman*, 825 S.W.2d 358, 359 (Mo.Ct.App.1992) (impairment of collateral is an affirmative defense); *American Vision Ctr. of St. Louis Centre, Inc. v. Carr Optical, Inc.*, 810 S.W.2d 121, 121 (Mo.Ct.App.1991) (unconscionability of a contract is an affirmative defense); *Chrysler Credit Corp. v. Friendly Ford, Inc.*, 535 S.W.2d 110 (Mo.Ct.App.1976) (impairment of collateral is an affirmative defense). The court must next consider whether Marilyn Garst's failure to plead these defenses until after CFA filed its motion for summary judg-

---

17. In addition to liability for the principal debt and interest, David Garst is liable for attorneys fees, because there is an attorneys fees provision in each of the 1993 loan documents. *See Mayor, Councilmen, and Citizens of the City of Liberty v. Beard*, 636 S.W.2d 330, 331 (Mo.1982) (en banc); *Empire Gas Corp. v. Small's LP Gas Co.*, 637 S.W.2d 239, 248 (Mo.Ct.App.1982). The court, while finding that CFA is entitled to a judgment including attorney fees, will determine the reasonableness of those fees upon the submission of final affidavits and any necessary or appropriate arguments. *See American Bank of Princeton v. Stiles*, 731 S.W.2d 332, 339 (Mo.Ct.App.1987) (reasonableness of attorneys fees award pursuant to contract is for the court to decide as a matter of law).

ment precludes their assertion in this litigation.

***i. Procedural bars to Marilyn Garst's affirmative defenses.*** In this case, Marilyn Garst did not make any factual allegations or raise any affirmative defenses in her answer to CFA's complaint. She asserted her affirmative defenses for the first time in her resistance to CFA's motion for summary judgment. However, it was not until September 20, 1995, some months after CFA's motion for summary judgment, Marilyn Garst's resistance, and CFA's reply were filed, that Marilyn Garst moved to amend her answer to assert baldly that she is an "accommodation party" on the 1993 Revolver Note and therefore entitled to assert her "surety" defenses.

Courts have held that failure to plead an affirmative defense to a claim in a responsive pleading waives or forecloses assertion of that defense for the first time later in the litigation, usually finding authority for this conclusion in *Fed.R.Civ.P.* 8(c), which specifically requires the pleading of affirmative defenses in responsive pleadings. *See, e.g., Jacobs Mfg. Co. v. Sam Brown Co.,* 19 F.3d 1259, 1266 (8th Cir.) (failure to plead affirmative defense of estoppel to claim for an unpaid account balance waived that defense, citing *Ronollo v. Jacobs,* 775 S.W.2d 121, 124 (Mo.1989) (en banc), but not *Fed. R.Civ.P.* 8(c)), *cert. denied,* —— U.S. ——, 115 S.Ct. 487, 130 L.Ed.2d 399 (1994); *United States v. Continental Illinois Nat'l Bank and Trust Co. of Chicago,* 889 F.2d 1248, 1253 (2d Cir.1989) (because *Fed.R.Civ.P.* 8(c) provides that affirmative defenses, both those listed and "any other matter constituting an avoidance or affirmative defense," shall be set forth in the answer to the complaint, " '[f]ailure to plead an affirmative defense in the answer results in "the waiver of that defense and its exclusion from the case," ' " quoting *Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984), in turn quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1278, at 339 (1969)); *TCP Indus., Inc. v. Uniroyal, Inc.,* 661 F.2d 542, 547 (6th Cir.1981) (non-compliance with UCC statute of frauds was an affirmative defense that had been waived by failure to plead it

under *Fed.R.Civ.P.* 8(c) where it was not raised until appeal); *United States v. Unum, Inc.,* 658 F.2d 300, 305 (5th Cir.1981) (affirmative defenses under the UCC, including "surety" defenses, must in most cases be specifically pled or the court will not consider them); *Automated Med. Labs., Inc. v. Armour Pharmaceutical Co.,* 629 F.2d 1118, 1122–23 (5th Cir.1980) (UCC statute of frauds defense was affirmative defense that must be specifically pleaded under *Fed. R.Civ.P.* 8(c), and, even with liberal amendment rules, mere mention of the defense in a trial memorandum did not preclude finding of waiver of the defense). However, some courts, notably our own circuit court of appeals and the Ninth Circuit Court of Appeals, have allowed assertion of affirmative defenses for the first time in response to a motion for summary judgment when there is no "prejudice" or "surprise" to the nonmoving party. *See Financial Timing Publications, Inc. v. Compugraphic Corp.,* 893 F.2d 936, 944 n. 9 (8th Cir.1990) (holding that an affirmative defense based upon a contractual limitations period may be raised for the first time on summary judgment if no prejudice or surprise is caused to the nonmoving party, because " 'technical failure to comply with Rule 8(c) is not fatal,' " quoting *Allied Chem. Corp. v. Mackay,* 695 F.2d 854, 855 (5th Cir.1983)); *see also Han v. Mobil Oil Corp.,* 73 F.3d 872, 877–78 (9th Cir.1995) (citing cases so holding); *Camarillo v. McCarthy,* 998 F.2d 638, 639 (9th Cir.1993) ("In the absence of a showing of prejudice, ... an affirmative defense may be raised for the first time at summary judgment."); *Moore, Owen, Thomas & Co. v. Coffey,* 992 F.2d 1439, 1445 (6th Cir.1993) (concluding that, despite the language of *Fed.R.Civ.P.* 8(c), "[i]t is well established ... that failure to raise an affirmative defense by responsive pleading does not always result in waiver," citing *Charpentier v. Godsil,* 937 F.2d 859, 863 (3d Cir.1991), and concluding that the real question is whether the plaintiff receives notice of the affirmative defense sufficiently early that the plaintiff is not prejudiced in its ability to respond). Although Marilyn Garst did not assert her affirmative defenses in a responsive pleading, but only raised them in her resistance to the motion for summary

**1386**

judgment, and then delayed some months before moving to amend her answer to incorporate her affirmative defenses, this matter is still not set for trial until September of this year, more than a year after CFA first had notice of Marilyn Garst's intention to raise these defenses. The court can find no prejudice to CFA in Marilyn Garst's assertion of these defenses now, particularly in light of CFA's seizing the opportunity to argue against the viability of these defenses in its reply brief. Furthermore, Marilyn Garst has now amended her answer specifically to assert these defenses. Therefore, if the affirmative defenses are otherwise viable, the court will find no "fatal" failure to comply with *Fed.R.Civ.P.* 8(c) in Marilyn Garst's failure to raise such defenses in the first instance in a responsive pleading to CFA's claim.[18]

***ii. Adequacy of the affirmative defenses.*** CFA contends that even if the affirmative defenses are not procedurally barred, they have no impact under the facts of this case. CFA argues that the state court proceedings in no way released CFA's collateral, or extended or increased Mrs. Garst's liability. Furthermore, CFA argues, there is no factual basis for asserting that the 1993 Revolver Note is either a contract of adhesion or unconscionable. Before considering these arguments, the court must, of course, first consider whether Marilyn Garst can establish at least a genuine issue of material fact that she is only an "accommodation party" on the 1993 loans, and therefore entitled to raise her suretyship defenses.

■■■■■ Missouri's version of the UCC adopts the general definition of an "accommodation party" as "one who signs the instrument in any capacity for the purpose of lending his name to another party to it." *See* Mo.Rev.Stat. § 400.3–415(1); *Madison–Hunnewell Bank v. Hurt,* 903 S.W.2d 175, 177 (Mo.Ct.App.1995); *Landmark KCI Bank v. Marshall,* 786 S.W.2d 132, 137–38 (Mo.Ct.App.1989). A signatory to an obligation becomes liable in the capacity in which he or she has signed, Mo.Rev.Stat. § 400.3–415(2); *Madison–Hunnewell Bank,* 903 S.W.2d at 177; *Landmark KCI Bank,* 786 S.W.2d at 137–38, which, in the case of an "accommodation party," means that the party is liable to the same extent as a "surety" and is entitled to raise "suretyship" defenses. *In re Estate of Wray,* 842 S.W.2d 211, 214 (Mo.Ct.App. 1992) (an "accommodation party" to a note is "liable thereon only as a surety"); *Landmark KCI Bank,* 786 S.W.2d at 138 ("The essential distinction between an accommodation maker and a usual maker is that an accommodation party is a surety, whereas a non-accommodation maker is not," citing Mo. Rev.Stat. § 400.3–415, and "an accommodation party may plead defenses available to a surety, but not to other parties on the instrument: discharge from liability because the holder releases a person against whom the accommodation party has a right of recourse

---

18. Almost as troubling to the court as Marilyn Garst's failure to plead the affirmative defenses for the first time in her answer is the inadequacy with which the affirmative defenses were ultimately pleaded. The court finds that the amended answer consists of little more than bald, conclusory assertions of the affirmative defenses unsupported by factual allegations. *See, supra,* note 2. Some courts dealing with affirmative defenses under the UCC have found that inadequate pleading of the factual basis for such affirmative defenses can bar them as a matter of law. *See, e.g., Curnutt v. Scott Melvin Transp., Inc.,* 903 S.W.2d 184, 191 (Mo.Ct.App.1995) (the factual basis for an affirmative defense must be set out in the same manner as is required for pleading of ·claims under Missouri Rules of Civil Procedure; thus, merely listing defenses as conclusory statements without pleading of any specific facts showing that the pleader is entitled to such a defense is inadequate, and any affirmative defenses inadequately

pleaded fail as a matter of law). Were the court, and CFA, confronted only with the pleading of the suretyship defenses belatedly offered in Marilyn Garst's amended answer, the court doubts that CFA would have been given adequate notice of the basis for those defenses to comply with the spirit of Rule 8(c), any more than the belated pleading of those defenses complied with the letter of that rule. *See Coffey,* 992 F.2d at 1445 (the "real question" of the timing and adequacy of pleading of affirmative defenses is whether the plaintiff receives notice of the affirmative defense sufficiently early that the plaintiff is not prejudiced in its ability to respond). Only because the factual basis for Marilyn Garst's affirmative defenses is considerably filled out by her arguments in resistance to summary judgment will the court even entertain those defenses here. CFA has received adequate notice of both the defenses and their factual basis to mount a counter argument, and has done so in its reply brief.

or because the holder unjustifiably impairs recourse to collateral for the instrument," citing § 400.3–606(1)(a), (b) & comment 1). However, "[p]ersons who sign as makers as part of the same transaction are jointly and severally liable unless the instrument specifies otherwise, and a maker who pays the instrument is entitled to contribution from other comakers." *In re Estate of Wray,* 842 S.W.2d at 214; *Landmark KCI Bank,* 786 S.W.2d at 136.

 Whether or not a person is an "accommodation party" on a loan to another, but to which both have given their signatures, is a matter of the intentions of the signers at the time of the execution of the paper. *Madison–Hunnewell Bank,* 903 S.W.2d at 177; *Landmark KCI Bank,* 786 S.W.2d at 137–38. The party asserting "accommodation party" status bears the burden of establishing such status. *Madison–Hunnewell Bank,* 903 S.W.2d at 177; *In re Estate of Wray,* 842 S.W.2d at 214; *Landmark KCI Bank,* 786 S.W.2d at 137–38. Parol evidence is admissible to make that proof, and the assessment of intention that someone be bound only as an accommodation party is a question of fact to be determined "from the language of the paper and from the amalgam of circumstances." *Madison–Hunnewell Bank,* 903 S.W.2d at 177; *Landmark KCI Bank,* 786 S.W.2d at 137–38.[19]

 The Missouri courts have repeatedly recognized that there are "two primary indicia of accommodation status," which are (1) that the accommodation party receives no direct benefit from the proceeds of the instrument, and (2) that the signature is needed by the maker to acquire the loan. *Madison–Hunnewell Bank,* 903 S.W.2d at 177; *Landmark KCI Bank,* 786 S.W.2d at 137–38; *In re Estate of Wray,* 842 S.W.2d at 214. Thus, "[a] person who signs a note in order to enable another party to the paper to obtain a loan is an accommodation party." *Landmark KCI Bank,* 786 S.W.2d

at 137; *McIntosh v. White,* 447 S.W.2d 75, 78 (Mo.Ct.App.1969). However, where the purported accommodation party's signature is "altogether irrelevant" to the willingness of the lender to lend to the maker, the "accommodation party" is in fact a co-maker. *Landmark KCI Bank,* 786 S.W.2d at 138. Similarly, the "receipt of proceeds from the instrument or other direct benefit is inconsistent with accommodation status of the signer," so that where the purported accommodation party derives pecuniary benefits from the loan, that person is not a mere "accommodation party." *Id.* at 140 (wife became joint owner of valuable machinery purchased with loan proceeds, and therefore could not claim to be an accommodation party); *Wright v. Wright,* 567 S.W.2d 371, 375 (Mo.Ct.App.1978) (person cannot be an accommodation party if it is shown that she received value in return for her signature on the instrument, and whether or not purported accommodation party received value can be a question of fact reserved for the trier of fact).

 In the present case, the court finds that Marilyn Garst has raised at least a genuine issue of material fact as to her status as merely an "accommodation party" on the loan to DGR. Marilyn Garst was not a partner in DGR, and there is no indication in the record that she received any direct or indirect benefit from that loan, except for the possible indirect benefit derived from her husband's continuing investment in DGR. Nowhere in the record has it been shown that Marilyn Garst ever had title in any DGR property. It is less clear from the record whether Marilyn Garst's signature to the 1993 Revolver Note was "irrelevant" or essential to CFA's willingness to loan money to DGR. *See, e.g., Landmark KCI Bank,* 786 S.W.2d at 137–38. These are questions of fact properly reserved for a jury. *Id.*

**19.** Although Judge Jarvey was correct that whether or not Marilyn Garst was an "accommodation party" is "predominantly [a] legal issue[ ]," Order of January 17, 1996, at 2, in this case, the factual circumstances are critical to a determination of whether or not Marilyn Garst is entitled to any of the suretyship defenses she has

raised by virtue of her purported "accommodation party" status. Each of those defenses depends upon a showing from the factual circumstances surrounding either the signing of the loan documents or the state court receivership proceedings.

▇▇▇▇ Nor is the court at all convinced that there are no genuine issues of material fact precluding Marilyn Garst's suretyship defenses or that CFA is entitled to judgment as a matter of law over those defenses. It is undisputed that the state court receivership proceedings disposed of collateral on the CFA line of credit and it is at least disputed whether Marilyn Garst had any notice of the disposition of collateral in those proceedings. Although CFA may have demonstrated from the record that *its* position was not impaired in those proceedings, because a lien was established in its favor, the court is not convinced that all of CFA's collateral was disposed of in those proceedings, such that CFA was unsecured as to the remaining indebtedness, or that Marilyn Garst's position was not impaired because of impairment of collateral in those proceedings.[20] Furthermore, whether or not Marilyn Garst was entitled to notice from CFA of the disposition of collateral on the note is also disputed. Finally, the court has been presented with no convincing argument that the 1993 Revolver Note was not a contract of adhesion or unconscionable as to Marilyn Garst, and recognizes a genuine issue of material fact concerning the extent to which Marilyn Garst was coerced by either CFA or David Garst to sign the 1993 Revolver Note. Thus, CFA is not entitled to summary judgment against Marilyn Garst on the 1993 Revolver Note.

## V. CONCLUSION

The court concludes that CFA is entitled to summary judgment in the amount of the unpaid balance, interest, and attorneys fees due under the 1993 Revolver Note against David Garst, but not against Marilyn Garst. The court concludes, first, that David Garst's counterclaim and any defenses asserted therein were properly stricken by Judge Jarvey as a sanction for failure to make discovery and failure to comply with a court order compelling discovery, and Judge Jarvey's order striking the counterclaim and defenses is

therefore **affirmed.** Because the counterclaim and defenses are stricken, CFA's motion for summary judgment on the counterclaim is **denied as moot.**

Next, the court concludes that there are no genuine issues of material fact concerning CFA's entitlement to judgment on the 1993 Revolver Note and that CFA is entitled to judgment on the note as a matter of law. Specifically, the court concludes that Orben Greenwald could and did, as a matter law, properly draw against DGR's line of credit, and that CFA did not improperly pursue David Garst on the note instead of first pursuing either the collateral or Orben Greenwald.

Turning from the question of CFA's entitlement to summary judgment on the 1993 Revolver Note, to the question of who can be held liable for such a judgment, the court concludes that David Garst is liable as a partner on the debt of the partnership. However, the court finds that genuine issues of material fact preclude summary judgment in favor of CFA on Marilyn Garst's liability on the 1993 Revolver Note. Marilyn Garst's belated assertion of her affirmative defenses is not fatal here, because CFA has been given sufficient notice of those defenses and their factual basis well in advance of the September 1996 trial date. The court finds genuine issues of material fact as to both indicia of Marilyn Garst's purported status as an "accommodation party," that is, whether her signature on the note was necessary before CFA would make a loan to DGR and whether she received any direct benefit from the proceeds of that loan. Furthermore, there are genuine issues of material fact raised by the state court proceedings that support Marilyn Garst's assertion of suretyship defenses to which she is entitled by virtue of her purported status as an "accommodation party."

Therefore, CFA's motion for summary judgment is **granted in part,** that is, as to

---

20. Compare, for example, CFA's assertion that all of its original collateral was disposed of in the receivership proceedings and the language of the state court order granting CFA a lien in the remaining DGR assets and other of David Garst's property. Furthermore, the fact that the CFA line of credit required adequate collateralization, but a principal balance left after any disposition of "all" collateral in the state court proceedings suggests that somehow the value of the collateral was indeed impaired.

David Garst, and **denied in part,** that is, as to Marilyn Garst. **Judgment shall be entered** in favor of CFA against David Garst in the amount of the principal balance due upon the 1993 Revolver Note, $82,148.78, plus interest in the amount of $8,869.78 accrued as of May 15, 1995, plus further interest accrued at the per diem rate of $36.57 to the date of this judgment. CFA shall file a post-judgment motion for an award of attorneys fees in compliance with N.D.Iowa LR 22 within twenty-one (21) days of the date of this order.

**IT IS SO ORDERED.**